**COLUMBIA UNIVERSAL LIFE INSURANCE CO., Appellant,**

v.

**Carl David MILES, Appellee.**

No. 08–94–00060–CV.

Court of Appeals of Texas, El Paso.

May 16, 1996.

Rehearing Overruled June 20, 1996.

---

3. We need not address appellants' remaining points of error. *See* Tex.R.App.P. 90(a).

Robert E. Motsenbocker, Shafer, Davis, McCollum, Ashley, O'Leary & Stoker, Inc., Odessa, for Appellant.

Robert E. White, Childs, Bishop & White Law Offices, Odessa, for Appellee.

Before MCCLURE, CHEW and WOODARD, (sitting by assignment), JJ.

### *OPINION*

McCLURE, Justice.

This appeal challenges the sufficiency of the evidence to support a jury finding that Appellant, Columbia Universal Life Ins. Co. ("Columbia"), canceled in bad faith the comprehensive health insurance policy issued to Appellee, Carl David Miles ("Miles"). We reverse and render judgment that Miles take nothing.

### *SUMMARY OF THE EVIDENCE*

On November 23, 1987, Miles and his mother, Wanda Miles, met with Karen Poynor ("Poynor") to discuss a change in the health insurance coverage for Miles and his family. The Mileses claim that they wished to change coverage because they were dissatisfied with the handling of certain claims by their existing carrier. After considering several companies, the Mileses settled on Columbia. Poynor filled out the application by asking the Mileses the questions listed on the application form and by filling in the answers given by them. Considerable dispute exists as to what transpired during this process. Both Miles and his mother testified that the application process took over two hours, and that the health histories of Miles, his wife, Toni, and their daughter, Kira, were copiously related to Poynor. Specifically, they asserted that certain conditions from which Miles suffered were extensively explained to Poynor, and that they suggested that Poynor have Columbia contact Dr. John Bray for a more extensive explanation of the conditions. However, these conditions were not listed in the application as relevant medical history, and Columbia was not made aware of them by either Poynor or Miles. Miles stated that he signed the application without reading it, while Poynor testified that she listed the

medical histories precisely as they were related to her. She denied ever being made aware that Miles suffered from any chronic condition.

Nine days after the application was completed, Columbia called Miles to conduct a personal history interview and to confirm the information in the application. During this interview, Columbia discovered that Kira had been treated for an ear infection. Beyond this fact, Miles represented to Columbia that the medical information in the application was complete and accurate. He did not mention at this time anything about his chronic conditions. The policy was issued on December 1, 1987. On January 22, 1988, Poynor delivered an amendment containing a rider excluding conditions related to Kira's ears. This amendment also required the insured to warrant that "since the date of the application no person to be insured under this policy has ... received treatment from or consulted any physician for any health condition not revealed in the application...." Miles claimed that he also signed this form without reading it. He did not inform Columbia that he had visited Dr. Bray for a sinus condition two days after the application was signed. Because he was under the impression that Columbia had contacted Dr. Bray and obtained his medical records, he did not feel obligated to discuss this condition over the telephone.

It is undisputed that Columbia did not know about Miles' entire medical history as required by the application, and that it issued a comprehensive health policy covering Miles and his family based solely on the information contained in the application and elicited through the personal history interview. Throughout his life, Miles has amassed an extensive medical history. At two years of age, he contracted what appeared to be polio after receiving the polio vaccine. As a result, blood tests were performed and it was discovered that he suffered from IGA immune deficiency ("IGA"). In 1967 or 1968, he was diagnosed with agammaglobulinemia. These conditions prevented his immune system from creating specific antibodies to ward off infections, and he suffered from chronic sinusitis. The conditions also made Miles susceptible to many different illnesses, and he received treatment for these conditions throughout his life. Because of the rarity of his affliction, he was studied at Duke and at Baylor Universities. His mother was a member of a national organization that provided support for and raised awareness of immune deficiency problems.

Miles began seeing Dr. Bray for his immune deficiency problems in 1983 and treatment continued through the time that the dispute between Columbia and Miles arose. In 1986, Dr. Bray recommended that Miles receive a gamma globulin treatment, but Miles refused because of cost.[1] In 1987, Miles' daughter received a live polio vaccine, and Dr. Bray insisted that Miles take the gamma globulin treatment in light of possible exposure to polio. He received the treatment as an outpatient at Women's and Children's Hospital in Odessa. This treatment was not reflected in the application. Indeed, the only mention in the application of a possible problem linked to the immune deficiency condition was in answer to a question inquiring about disorders of the nose or throat. While Miles responded that he received medication from Dr. Bray for a sinus infection, he did not relate the sinus infection to the chronic immune deficiency condition.

In May 1989, Miles was treated by Dr. Rex Reynolds for a hemogenic bladder related to his immune deficiency condition. He filed a claim with Columbia for the expense. Columbia requested a claimant statement from Miles; however, he delayed forwarding this statement to Columbia until it had made a third request. The bulk of the delay in processing the claim resulted from the tardiness of the statement from Miles. After the statement was received, Columbia requested Dr. Bray's medical records relating to Miles because Dr. Bray was listed as the referring physician. Upon receiving these records, Columbia learned for the first time that

---

1. The record reflects that Miles' insurance carrier at that time would not pay for the treatment because it related to a preexisting condition.

Miles suffered from IGA and agammaglobulinemia.

The claims department forwarded Miles' claims file to the underwriting department to reunderwrite the policy. Columbia's underwriting manual specified that applicants with agammaglobulinemia were not insurable. Columbia consulted with its medical and legal experts concerning Miles' conditions and the omissions of any mention of those conditions in the application, the telephone interview, and the amendment to the policy. Based on the opinions of these experts and based on Miles' conditions, the lack of any mention of them, and the fact that Miles had been denied coverage for it by another insurance company, Columbia concluded that Miles had intentionally concealed his conditions to induce Columbia to provide coverage. On this basis, Columbia decided to rescind the policy and refund all premiums Miles had paid to date. However, Columbia reached this conclusion without ever contacting Miles or Poynor to discuss the situation and confirm its conclusion.

Columbia's attorney wrote to Miles informing him of Columbia's intention to rescind the policy, and offering Miles an opportunity to agree to the rescission and an immediate refund of his premiums in exchange for a release of all claims Miles might have had against Columbia. Miles refused the offer. Columbia then filed a declaratory judgment action in Harris County to determine its rights under the policy and to effectuate a rescission. Specifically, it sought a judicial determination of Miles' intent to deceive Columbia concerning his immune deficiency problem. Miles filed a breach of contract and bad faith action in Ector County. These actions were consolidated in Ector County, and the breach of contract claim was abandoned.

Columbia appeals an adverse judgment in six points of error. The first point of error challenges the legal sufficiency of the evidence to show Columbia acted in bad faith. The next four challenge elements of the damage award. The final point of error asserts that the trial court erred in allowing evidence of Columbia's net worth to be presented to the jury.

### BAD FAITH CLAIMS AND LEGAL SUFFICIENCY: WHAT COUNTS AS EVIDENCE THESE DAYS?

The Texas Supreme Court first extended the cause of action for breach of the duty of good faith and fair dealing to insurance companies in 1987. In *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex.1987), the Supreme Court stated that a cause of action for breach of the duty of good faith and fair dealing exists when "it is alleged that there is no reasonable basis for denial of a claim or delay in payment *or* a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." [Emphasis added]. *Id.* at 167.[2] This cause of action contained two elements, stated in the *alternative*. The first element looked to the basis upon which the insurer acted and asked whether a reasonable insurer would have acted upon that basis in a similar manner. *Arnold*, 725 S.W.2d at 167. This inquiry did not depend on the ultimate legitimacy of the basis, but it instead looked to the reasonableness of any reliance on it. *See, e.g., Aetna Casualty & Sur. Co. v. Garza*, 906 S.W.2d 543, 549–50 (Tex.App.—San Antonio 1995, no writ) (stating that "the tort of bad faith is not to be confused with negligence, the duty owed by an insurer to its insured is stated in familiar negligence terms: the insurer owes that degree of care and diligence in handling the insured's claim which a person of ordinary care and prudence would exercise in the management of his own business"). Much of the confusion surrounding this element stems from the fact that bad

2. The Court based this cause of action on the "special relationship [that] arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims." *Arnold*, 725 S.W.2d at 167. Because insurance companies possessed nearly complete control over the claims process, some sort of balancing factor was needed to ensure that insurance companies did not settle claims arbitrarily. *Id.* In other words, the duty of good faith and fair dealing was designed to remove the financial incentive for insurance companies to deny or delay meritorious claims. *Id.*

faith is largely a state of mind. However, the "no reasonable basis" standard attempts to objectify these subjective elements. As a result, some sort of context is needed to give the fact-finder perspective. In other words, the reasonableness of the insurer's reliance on a set of facts suggesting noncoverage must be judged against the backdrop of the entire contractual dispute. The controversy over the resolution of this question centers mainly on the determination of what evidence is relevant to the question of reasonable reliance. This in turn requires a crisp definition of reasonableness—a definition that is currently lacking.

The second element of the *Arnold* bad faith test dealt with the insurer's duty to adequately investigate claims. Arguably, the essence of the duty of good faith and fair dealing centers around this duty to investigate. Investigation is intricately tied to the insurance company's need for a reasonable basis on which to dispute a claim. *See State Farm Mut. Auto Ins. Co. v. Zubiate,* 808 S.W.2d 590, 597 (Tex.App.—El Paso 1991, writ denied). It determines the reasonableness of an insurer's reliance on an asserted basis. This duty to investigate claims provided an insured with a tremendous weapon for challenging an insurance company's claims practice. *See, e.g., State Farm Fire & Casualty Co. v. Simmons,* 857 S.W.2d 126, 136 (Tex.App.—Beaumont 1993, writ denied) (holding that the insurer had a duty to conduct a "thorough, systematic, objective, fair, and honest investigation" notwithstanding the company's reliance on the arson defense to the claim). However, this duty has suffered dwindling importance in bad faith analysis and is in danger of being completely eradicated.

The Supreme Court revisited bad faith in the insurance context in *Aranda v. Insurance Company of North America,* 748 S.W.2d 210 (Tex.1988). There the Court extended the cause of action to worker's compensation carriers, but restated it in such a way that the elements are now stated in the conjunctive rather than the disjunctive, thus suggesting that both elements must be prov-

en to establish a prima facie case. *Id.* at 213; *see also* R. Kent Livesay, *Levelling the Playing Field of Insurance Agreements in Texas: Adopting Comparative Bad Faith as an Affirmative Defense Based on the Insured's Misconduct,* 24 Tex.Tech L.Rev. 1201, 1206 (1993). The Court stated that a claimant "must establish (1) the absence of a reasonable basis for denying or delaying payment of the benefits of the policy *and* (2) that the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim." [Emphasis in original]. *Aranda,* 748 S.W.2d at 213. To support this new version of the bad faith cause of action, the Court did not cite its prior decision in *Arnold,* but instead cited to two cases from the Supreme Courts of Colorado and Wisconsin. The Court justified this reformulation of the cause of action as follows:

> The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. The second element balances the right of an insurer to reject an invalid claim and the duty of the carrier to investigate and pay compensable claims. This element will be met by establishing that the carrier actually knew there was no reasonable basis to deny the claim or delay payment, or by establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial or delay. Under the test, carriers will maintain the right to deny invalid or questionable claims and will not be subject to liability for an erroneous denial of a claim.

*Aranda,* 748 S.W.2d at 213. This simple change in phraseology from "or" to "and" set the stage for an effective dismantling of the bad faith cause of action. The Supreme Court has used this test to isolate an insurer's duty to investigate claims and make it dependant on the scope of facts necessary to establish a reasonable basis. Apparently, once a reasonable basis is made out, the insurer's duty to investigate a claim ceases.[3]

---

**3.** The Supreme Court briefly reasserted the *Arnold* standard and the insurer's duty to investi-

gate in *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567–68 (Tex.1990) ("The 'special

Subsequent to *Arnold* and *Aranda*, two schools of thought developed in the lower appellate courts concerning the "no reasonable basis" element of bad faith. *See State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 283–87 (Tex.App.—San Antonio 1992, writ denied) (discussing cases in an extensive manner); David L. Plaut, Lyons v. Millers Casualty: *The Last Word on the Standard for Assessing Bad Faith in Texas?*, 57 TEX. B.J. 832 (1994). The extremes of these schools are best represented by *Polasek* on the one hand and *Simmons* on the other. Although the facts in these cases are similar, they reached widely divergent results. In *State Farm Lloyds, Inc. v. Polasek*, the San Antonio Court of Appeals focused on the asserted basis upon which the insurance company relied. 847 S.W.2d at 285. State Farm challenged the insured's claim based on its belief that arson was involved. *Id.* at 283. The Court looked solely to the evidence suggesting arson to determine whether State Farm had a reasonable basis. *Id.* at 287. The Court held that if the evidence constituting the basis was undisputed and of such substance that it was not fanciful or flimsy, the first prong of *Aranda* failed and the insurance company acted in good faith as a matter of law. *Id.* at 284, 287. This isolationist view disregarded evidence that may have demonstrated unreasonableness; instead reasonableness was gauged solely by the substance of the undisputed evidence supporting the insurer's basis. *Id.* at 287.[4] This view suggests that an insurer's duty to its insured extends only as far as the establishment of a bona fide claim dispute.

The Beaumont Court of Appeals sharply criticized *Polasek* in *State Farm Fire & Casualty Co. v. Simmons*, 857 S.W.2d at 133–36, 142–43 (asserting that *Polasek* abrogates the duty of good faith and fair dealing). The Court claimed that the *Polasek* rule would allow insurers to deny claims based on any selective set of facts and would encourage insurers to investigate claims solely for facts establishing a claim dispute. *Id.* at 134–35. It rejected the *Polasek* bona fide dispute rule. Instead, it measured reasonableness against the totality of the transaction leading to the claim dispute. *Id.* at 136–37. It emphasized the adequacy of the insurance company's investigation to determine whether its asserted basis for denial or delay was indeed reasonable. *Id.; see also Zubiate*, 808 S.W.2d at 598 (failure of insurance company to visit site of accident in Mexico to determine whether accident occurred outside the twenty-five mile zone of coverage was some evidence of "no reasonable basis"). In other words, the insurer was held liable for its negligent investigation of the claim. *Simmons*, 857 S.W.2d at 136–37.

Because of the divergence of opinion over the bad faith cause of action, the Supreme Court, in *Lyons*, 866 S.W.2d at 598, attempted to "clarify the method by which Texas courts should conduct legal sufficiency review of factfindings of bad faith against an insurer." In the process, it established a particularized application of the traditional "no evidence" review. *Id.* at 600. When conducting a legal sufficiency review of a bad faith find-

---

relationship' between the insured and insurer imposes on the insurer a duty to investigate claims thoroughly and in good faith, and to deny those claims only after an investigation reveals there is a reasonable basis to do so."). However, the *Arnold* standard has since been subsumed by *Aranda* and is of dubious validity standing alone. *See Lyons v. Millers Casualty Ins. Co. of Texas*, 866 S.W.2d 597, 599–600 (Tex.1993) (stating both standards). The *Lyons* Court acknowledged the difference in the standards, but it limited its analysis to the *Aranda* standard because the case was originally tried under that formulation. *Id.* at 600 n. 2. The Court, in a later case, effectively folded the *Arnold* standard into the *Aranda* standard by citing both cases favorably and applying them as providing a single test. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994).

4. The Court made the following assertion about the standard of reasonableness required to fulfill an insurer's duty of good faith and fair dealing:

> We recognize that under *Aranda* and *Arnold* the basis for denying the claim must be reasonable. But this does not authorize the trier of fact to second-guess the insurer about reasonableness. And it does not authorize the trier to decide whether the insurer acted reasonably. It means that the basis for denying or delaying payment must have some substance to it; it cannot be fanciful or flimsy. Not just any asserted basis will suffice. A scintilla of evidence suggesting arson would not be enough.
> *Id.*

ing, a court should focus on the evidence arguably supporting the bad faith finding and the relationship of that evidence to the elements of bad faith. *Id.* Only if that evidence, viewed in the light most favorable to the prevailing party, permits the logical inference that the insurer had no reasonable basis to delay or deny payment of the claim and that it knew or should have known that it had no reasonable basis will the no evidence challenge fail. *Id.* "The evidence must relate to the tort issue of no reasonable basis for denial or delay in payment of a claim, not just to the contract issue of coverage." *Id.*

Though seemingly logical on its face, this standard of review does little to clarify what evidence is relevant to the question of reasonableness. *Cf. Garza,* 906 S.W.2d at 549–50 (attempting to discuss the reasonableness element). In *Lyons,* the Court held that testimony of the insured's expert witness, her neighbors, and her own testimony that the damage to her house was caused by a covered event was not evidence that would support an inference of bad faith. *Lyons,* 866 S.W.2d at 600–01. It was evidence of coverage only. In other words, conflicting evidence of coverage alone does not permit the logical inference that the insurance company was unreasonable in relying on its evidence. Furthermore, the Court held that the insurer's refusal to contact the insured after the claim was denied the first time, though unfavorable conduct, did not permit the logical inference that it "acted unreasonably in denying the claim based on [its expert's] report." *Id.* at 601 n. 3. After discussing what evidence did not provide the necessary logical inference, the Court provided several scant clues as to what evidence would be sufficient. It found that the insured presented no evidence that the expert's reports were not objectively prepared or that the insurer's reliance on them was unreasonable. Specifically, the Court stated that "[e]vidence of coverage might in some circumstances support a finding that an insurer lacked any reasonable basis for denying a claim, for example, when the insurer unreasonably disregards the evidence of coverage." *Id.* at 601. These statements, in essence, modify the scope of reasonableness

required of insurance companies under the *Aranda* standard. One way in which an insurer could unreasonably ignore evidence of coverage would be to predicate its decision on a flimsy or fanciful basis. Stated another way, reasonableness goes to the substance of the evidence supporting the insurer's basis, not to the transaction when viewed as a whole. The *Polasek* bona fide dispute standard appears to best harmonize with the stance taken by the Supreme Court in *Lyons* and its progeny.

In *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Dominguez,* 873 S.W.2d 373 (Tex.1994), the Supreme Court seems to apply this standard. The Court began by noting that the principle problem facing an insured in asserting a bad faith claim is that he must prove a negative. *Id.* at 376. A positive showing of mere unreasonableness on the part of the insurer is not enough; the insured must affirmatively demonstrate both the absence of a reasonable basis and that the insurer knew or should have known that such a basis did not exist. *Id.* In conducting a *Lyons* legal sufficiency review, a court must first determine what potential basis the insurance company had for its action. *Id.* at 376. Only after this basis is located may a court analyze the evidence supporting a "no reasonable basis" finding. *Id.* The Court held that statements made by the insured and reports of physicians who examined him were a reasonable basis upon which the insurer could dispute a worker's compensation claim. *Id.* at 376–77. The Court further held that evidence showing that the injury was work related was relevant only to the coverage claim, and did not call into question the insurer's reliance on its asserted basis. *Id.* Interestingly, the Court, without explanation, leaped from identifying the insurer's potential basis to finding that this basis was reasonable. One way to explain the reasonableness finding in *Lyons* is to apply the *Polasek* flimsy or fanciful basis standard. This conclusion is consistent with the Court's assertion that only evidence which casts doubt on the insurer's basis can be considered legally sufficient evidence of no reasonable basis.

Presumably, the Supreme Court adopted a form of the bona fide dispute rule in *Moriel,* 879 S.W.2d at 17–18 and n. 8. There the Court held that "[e]vidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." *Id.* at 17. The evidence must point to some form of bad faith and not solely to the coverage dispute underlying the transaction. In an attempt to elucidate what evidence permitted a "logical inference" of no reasonable basis for *Lyons* purposes, the Court drew a distinction between the materiality of evidence for purposes of admissibility, *see* TEX.R.CIV.EVID. 401, and the standard for determining whether the evidence is legally sufficient. *Moriel,* 879 S.W.2d at 24–25. The Court held that the proof of bad faith offered by the insured must possess such a degree of probative force that reasonable minds could differ in their conclusions. *Id.* (citing William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 522–23 [1991] ). If reasonable and fair-minded people can only conclude that the proffered evidence of bad faith lacks any probative force, the insurer has established the existence of a bona fide contractual dispute as a matter of law. Therefore, evidence of coverage, though relevant for purposes of admissibility, when viewed in conjunction with all other evidence offered by the insured, may lack the probative force necessary to dissolve the insurer's asserted basis.

■■■ As this discussion illustrates, the Supreme Court, in its attempt to clarify the legal sufficiency standard for bad faith claims against insurance companies, has ultimately done little to provide lower courts with any guidance for conducting a legal sufficiency review. *Lyons* and its progeny have not changed in the least the standard for legal sufficiency review. They have, however, fundamentally changed the nature and substantive framework of the bad faith claim. These cases represent a tacit adoption of a modified form of the *Polasek* bona fide dispute rule which requires a court to ascertain the potential basis relied upon by the insurer. *Dominguez,* 873 S.W.2d at 376. The court must then conduct a qualitative evaluation of that basis to determine whether an insurer could

reasonably rely on it. *See Polasek,* 847 S.W.2d at 287. In conducting this qualitative evaluation, the court must ask both how the insurer's evidence was obtained and what that evidence, if accepted as true, suggests about the validity of the claim. If nothing is presented suggesting that the evidence upon which the insurer relied was obtained in an unobjective or unfair manner and if that evidence, viewed in isolation, reasonably suggests that the insured's claim is invalid or questionable, the insurer's basis is reasonable as a matter of law. *See* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 359, 363–64 (1960) (stating that a no evidence point of error may be sustained if "the evidence establishes conclusively the opposite of the vital fact"); *see also Polasek,* 847 S.W.2d at 284. In conducting this evaluation, a court must determine whether the insurer's basis has substance sufficient to justify reliance upon it or whether it is merely frivolous. *See id.* at 287 ("A scintilla of evidence suggesting arson would not be enough."). Furthermore, the Supreme Court has effectively moved the goal line—evidence presented by the insured that demonstrates a mere conflict with the insurer's evidence, for the most part, is never legally sufficient to support a bad faith claim. This rule preserves the insurer's right to choose whom it will believe.

To establish a bad faith claim, an insured must make affirmative inroads on this qualitative evaluation of the insurer's basis. Only if the evidence proffered by the insured falls within the scope of this evaluation process can the insured survive a legal sufficiency challenge. For example, an insured may present evidence that the reports of the insurer's experts were not objectively prepared. *See Lyons,* 866 S.W.2d at 601. Or the insured may present evidence that the insurer conducted its investigation solely to justify a preconceived result. *See Darby v. Jefferson Life Ins. Co.,* No. 01–91–00255–CV, —— S.W.2d ——, 1995 WL 258120 (Tex. App.—Houston [1st Dist.] May 4, 1995, n.w.h.); *Simmons,* 857 S.W.2d at 131. Or the insured may present such overwhelming evidence of coverage that the underlying claim is established as a matter of law. *See*

Powers & Ratcliff at 523–25. Because reasonable minds could not differ as to the validity of the claim, the insurer's reliance on a contrary basis is by definition unreasonable. Although this standard of proof is extremely high, it comports with the judicially changing nature of an insurer's duty of good faith and fair dealing. An insurer's legal duty may end abruptly at the first sign of some legitimate dispute, but its moral duty to do the right thing necessarily extends to all aspects of its business dealings. Perhaps economic or legislative pressures will compel insurance companies to conduct their businesses, with utmost fairness, especially in those areas where the law no longer reaches.

### BAD FAITH CANCELLATION OF AN INSURANCE POLICY

■ The Supreme Court extended the bad faith cause of action to situations in which an insurance company cancels a policy without a reasonable basis in *Union Bankers Insurance Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex.1994) ("A cause of action is stated by alleging that the insurer had no reasonable basis for the cancellation of the policy and that the insurer knew or should have known of that fact."). The Court also based the cause of action on the great disparity of bargaining power that exists between the insurance company and the insured. *Id.* (finding disparity in the insurer's ability to unilaterally cancel an insurance policy and the insured's inability to prevent that cancellation). *Shelton* presented facts similar to those in this case. In *Shelton*, the insured represented on his application for insurance that he had no indications of any disorders of the skeletal or muscular systems. *Id.* at 279. The insurance company issued the policy based on the application. *Id.* Seven months after the policy was issued, Shelton underwent a hip replacement operation to correct necrosis in his left hip joint. *Id.* The insurance company, upon receiving a claim from Shelton for the operation, asserted that the condition was preexisting, denied the claim, and requested that Shelton sign a rider excluding all hip disorders. *Id.* Shelton refused. *Id.* The insurance company then canceled Shelton's policy and refunded his premiums. *Id.*

■ As an initial matter, the Court found that before an insurance company may cancel a policy based on a misrepresentation in the application, the company must show an intent to deceive on the part of the insured. *Shelton*, 889 S.W.2d at 281–82 (holding that "an intent to deceive must be proved to cancel a health insurance policy within two years of the date of its issuance when the cancellation is based on the insured's misrepresentation in the application for insurance"). Failure of the insurance company to show intent to deceive makes any cancellation within two years of the policy's issuance a breach of the contract as a matter of law. *Id.* The case at bar differs from *Shelton* in that Columbia did not simply cancel the policy and refund the premiums. It offered Miles an opportunity to agree to the proposed rescission and refund. Only after this request was refused did Columbia seek to cancel the policy. Further, it did not simply cancel the policy; it brought a declaratory judgment action in Harris County to determine its rights under the policy. It appears to us that the policy was never canceled as it was in *Shelton* inasmuch as Columbia merely sought a judicial determination of its rights under the policy. However, because the parties treat this transaction as a cancellation, we address it accordingly. In so doing, we recognize that the same principles that apply the bad faith cause of action to an instance of outright cancellation apply with equal force to an attempted cancellation when the company has no reasonable basis for its actions.

The *Lyons* particularized legal sufficiency review applies in the case of bad faith cancellation of an insurance contract just as it does in the claims practice area. *See id.* at 286 (Phillips, C.J., concurring). Therefore, the same standard for judging reasonableness applies. Interestingly, the Court in *Shelton* remanded the case for a determination of the bad faith claim despite the insurance company's assertion that no evidence existed in the record proving that it had no reasonable basis. A plurality held that the insurance company's initial correspondence with Shelton admitting that the omission was probably an oversight, its failure to discuss the situation with Shelton before making its decision,

and the lack of a contract term suggesting that such an omission could be used as a basis for cancellation of the policy were some evidence of bad faith. *Shelton*, 889 S.W.2d at 284. In his concurrence, Chief Justice Phillips agreed with this assessment. *Id.* at 286. However, he conditioned his opinion on the fact that the *Lyons* standard of review was not presented to the Court, and he did not employ its particularized review to the evidence found by the majority. *Id.* Justice Enoch did not take part in the decision of the case. Justice Cornyn, joined by Justices Gonzales and Hecht, dissented from the decision to remand the case, asserting that the evidence of bad faith did not permit the logical inference that the insurer lacked a reasonable basis. *Id.* at 287–88. Specifically, these pieces of evidence did not cast doubt on the particular basis relied on by the insurer. *Id.* at 288 and n. 3 ("The record reveals considerable evidence from which *the jury could have concluded that Shelton intended to deceive his insurer.*"). [Emphasis in original]. Furthermore, the dissent held that the insurer's failure to discuss the matter with Shelton was relevant only to the second prong of the *Aranda* test, whether the insurer knew or should have known that it did not have a reasonable basis. *Id.* at 287. Actual discussion with Shelton would not have presented any evidence that would have cast doubt on the insurer's basis. *Id.* at 287 n. 2. Given the peculiar disposition of the *Shelton* legal sufficiency analysis, we would be hard pressed to rule that an insurer's failure to contact the insured prior to asserting its right to question the validity of statements made on the application is *per se* legally sufficient evidence of bad faith. It is doubtful the Supreme Court would so rule.

Factually analogous to the case at bar is *Darby v. Jefferson Life Ins. Co.*, No. 01–91–00255–CV, —— S.W.2d ——, 1995 WL 258120 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.). *Darby* was decided on the claims issue rather than on bad faith cancellation. *Id.* at ——, n. 3. Darby applied for an insurance policy and related her medical history to an independent agent who filled out the application. *Darby v. Jefferson Life Ins. Co.*, No. 01–91–00255–CV, slip op. at 1, —— S.W.2d ——, ——, 1995 WL 258120 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.). Some of the information Darby told the agent was not included in the application. *Id.* In addition, the information in the application itself was manifestly inconsistent. *Id.* at ——. The insurer discovered through a personal history interview that Darby had seen a doctor eight to ten times over the previous two years and that she had a history of migraines, blood clots, and arthritis. *Id.* at ——. The company issued Darby a policy excluding coverage for migraines and any disease or condition of the cardiovascular system notwithstanding the conflicts in the application concerning Darby's medical history and the company's underwriting guidelines prohibiting the issuance of a policy to a person who has seen a doctor more than eight times during the two years prior to the application date. *Id.* Three months after receiving the policy, Darby was hospitalized with acute diverticulitis. *Id.* Asserting that the diverticulitis was an undisclosed preexisting condition constituting a misrepresentation on Darby's part, the insurer denied Darby's claim and terminated her policy. *Id.* During the trial of Darby's bad faith claim, she presented evidence that one of the insurer's past presidents had directed its claims manager to rescind policies and refund the premiums if they had evidence sufficient to stand up in court and with the State Board of Insurance. *Id.* The insurer's current president testified at trial that Darby's condition was not a preexisting condition and that the cancellation was based on other misrepresentations in the application. *Id.*

After discussing the *Lyons* standard, the Court held that an insurer may rely on a misrepresentation defense as the basis for its action. *Id.* at ——. An insurer must prove (1) the making of a representation, (2) the falsity of that representation, (3) reliance by the insurer on that representation, (4) the insured's intent to deceive the insurer with the misrepresentation, and (5) the materiality of the representation. *Darby v. Jefferson Life Ins. Co.*, No. 01–91–00255–CV, —— S.W.2d ——, 1995 WL 258120 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.). The Court found that the insurer had no reasonable basis for the cancellation because its own evidence was conflicting and, if believed, did

not establish the elements of the misrepresentation defense. *Id.* at ———. The conflicting evidence in the application made a finding of falsity impossible. *Id.* The insurer also issued the policy contrary to its underwriting guidelines. *Id.* Furthermore, the insurer admitted that it did not believe that Darby intended to deceive it, and it presented no evidence suggesting intent. *Id.* The Court concluded that the basis relied on by the insurer did not have substance sufficient to justify the actions of a reasonable insurer. *Id.*

The instant cause differs from *Darby* in that the record reveals that Columbia had ample evidence, if believed, to satisfy all elements of the misrepresentation defense. Columbia's decision to rescind the contract was based on a great deal of data discovered after an extensive investigation. It is undisputed that Miles' IGA and agammaglobulinemia were not revealed in the application. Furthermore, Miles signed the application representing that the answers in it were true, complete, and correctly recorded and that he understood that the policy would be issued based on those answers. Miles did not reveal these conditions to Columbia during the telephone interview, although he had received treatment by Dr. Bray for these conditions during the nine-day interval. Miles signed an amendment to the policy warranting that the representations made in the application remained true and correct and that nothing had occurred in the interim to change those representations. Dr. Bray's medical records revealed that for years prior to applying to Columbia for insurance, Miles had suffered from these conditions and had received extensive treatment. The records also revealed that Miles had been refused coverage by another insurance company because of these preexisting conditions. This evidence standing alone strongly suggests that Miles intentionally omitted his conditions from the application to induce coverage from Columbia. Finally, Columbia's own underwriting guidelines mandated denial of coverage for those applicants suffering with the conditions that afflicted Miles. These undisputed facts provided Columbia with a basis for action that was not flimsy or fanciful. Indeed, they suggest that Columbia had a legitimate claim with which to challenge the validity of the policy.

 The only evidence indicating that Columbia had no reasonable basis to rescind the policy is that it did not contact Miles or Poynor prior to contacting its attorneys.[5] To establish that an omission in the insurer's investigation is evidence of bad faith, the insured must demonstrate that the deficiency in some way affirmatively casts doubt on the insurer's basis. *Lyons,* 866 S.W.2d at 601 and n. 3. For example, the insurer must show that had it conducted an investigation, it would have discovered evidence that it lacked a reasonable basis. *Id.* Furthermore, this evidence must suggest more than a mere conflict in the underlying contractual dispute. *Id.* Miles first learned that Columbia was denying his claim, asserting that he intentionally deceived the company by lying on his application, and instituting rescission procedures when he received a letter from Columbia's attorney. This letter stated that Columbia's claim was based on the application and the medical records of Dr. Bray, requested that Miles agree to the rescission of the policy and to a release of all claims against Columbia, and offered in exchange a refund of all premiums paid by Miles. The letter also informed Miles that the refund would be more than adequate to cover the claim. Miles did not present evidence that he attempted to respond to the letter with his explanation that the omissions from the application were nothing more than a misunderstanding and that he did not possess the intent to deceive Columbia when he submitted the flawed application. Instead, he simply refused to agree to the rescission. Columbia then sought a judicial determination of the intent to deceive question. Miles countered with this bad faith action.

---

5. On appeal, Miles addresses the question of intent to deceive. However, this question is separate from a finding that Columbia breached its duty of good faith and fair dealing. Columbia may in good faith challenge Miles' intention and ultimately prove to be in error. *Shelton,* 889 S.W.2d at 288 (Cornyn, J., dissenting). The question in the bad faith context is not whether Miles actually intended to deceive Columbia, but whether Columbia possessed a reasonable basis for its actions.

Had Columbia contacted Miles and Poynor prior to contacting its lawyers, it would have discovered nothing that called into question evidence upon which Columbia ultimately relied. Miles' defense to Columbia's intentional deception assertion constitutes a veritable swearing match between himself and Poynor. He claimed that he informed Poynor of his conditions and suggested that Poynor have Columbia obtain Dr. Bray's records for a more complete description of these conditions. He argued that if these conditions were not listed on the application and that if Columbia did not have Dr. Bray's records, it was Poynor's fault. He made these assertions despite his failure to read the application and despite his signature representing that the information contained in it was true and accurate. Poynor disputed this testimony on every point. She asserted that she fully listed the medical history given by Miles and that he did not mention his IGA or agammaglobulinemia. She also testified that he read the application prior to signing it. This evidence that Columbia could have obtained from Miles and Poynor does not cast doubt on its basis for rescinding the policy. Columbia had the right to question the assertions of an interested party. It also had the right to obtain a judicial determination of its rights under the policy.

We are presented with exactly the situation that the *Aranda* test was tailored to accommodate. If Columbia's failure to contact Miles prior to seeking a legal remedy is evidence that Columbia possessed no reasonable basis for its actions, then no insurance company could establish the necessary intent to deceive element required by *Shelton* without fear that it will be subjected to a bad faith cause of action. This result would unnecessarily impede an insurance company's right to challenge representations in an application that it believes were false and made with the intent to induce issuance of a policy.

### CONCLUSION

Columbia's Point of Error No. One is sustained. Because of our disposition, resolution of Columbia's remaining points of error is unnecessary. The judgment of the trial court is reversed and judgment rendered that Miles take nothing.