**STATE FARM LLOYDS, Petitioner,**

v.

**Ioan and Liana NICOLAU, Respondents.**

No. 94–0287.

Supreme Court of Texas.

Argued Nov. 16, 1994.

Decided July 9, 1997.

Rehearing Overruled Oct. 2, 1997.

Paul Dodson, Corpus Christi, for petitioner.

Savannah Robinson, Russell H. McMains, Corpus Christi, Stacy L. Keaton, Houston, for respondents.

SPECTOR, Justice, delivered the opinion of the Court, in which CORNYN, ENOCH, BAKER and ABBOTT, Justices, join.

This cause presents several questions about an insurer's liability for extracontractual damages. The court of appeals upheld jury findings of bad faith and malice, allowing the insureds to recover both mental anguish and exemplary damages. 869 S.W.2d 543. We agree that some evidence supports the jury's finding that the insurer violated its duty of good faith and fair dealing. In addition, we hold that there is no evidence that the insurer acted unconscionably or with malice. Because the latter holding eliminates the Nicolaus' recovery of common-law exemplary damages, we remand this cause to the court of appeals to consider the Nicolaus' entitlement to additional damages on statutory grounds.

In the insurance claim giving rise to this dispute, Ioan and Liana Nicolau sought coverage for extensive foundation damage at their Corpus Christi home. The Nicolaus' homeowners policy, issued by State Farm Lloyds, generally excludes losses caused by "inherent vice," or by "settling, cracking, bulging, shrinkage, or expansion of foundations." Under an express exception, however, these exclusions do not apply to losses caused by an "[a]ccidental discharge, leakage or overflow of water" from within a plumbing system.

The Nicolaus first experienced foundation problems in 1984, when cracks appeared in their walls. Unaware that the problems might be attributable to a plumbing leak and thus covered under their policy, the Nicolaus did not, at that time, file a claim. Instead, they hired Michael Krismer, a foundation repair contractor, to inspect the house. On his recommendation, they also engaged Dexter Bacon, a structural engineer with Maverick Engineering. After examining the house, Krismer and Bacon concluded that the ongoing drought that year—combined with four mesquite trees in the Nicolaus' front yard— was drying the soil under the front part of the house, causing the front of the house to sink. To prevent further downward movement, Krismer installed a series of concrete piers beneath the front of the house and part of the sides.

In 1986, the Nicolaus again noticed cracks in the interior and exterior of the house. Krismer again inspected the house but concluded that the cracks were insignificant. Krismer and Bacon both inspected the house again in 1988. Bacon determined that the piers installed in 1984 were providing adequate support. Krismer inspected the house once again in June 1989, and likewise concluded that the piers were continuing to function. Not yet realizing that they had a problem that might be covered under their insurance policy, the Nicolaus still did not file a claim.

In late 1989, however, Krismer became alarmed by additional foundation movement at the Nicolau home. One set of elevations indicated that the back of the house was five inches higher than the front. In Krismer's words, the rear end of the house appeared to be "digging up out of the ground." There was significant cracking in the sheetrock and exterior brick, and doors and cabinets were not closing properly.

At Krismer's request, Bacon reexamined the house. Bacon realized there was a problem and referred the matter to Fred Hayden,

a licensed civil engineer with Maverick Engineering. Krismer, Bacon, and Hayden together determined that the problem was with *swelling* of the soil at the *back* of the house rather than contraction of the soil at the front of the house. For that reason, they decided to test for leaks in the drainline system under the foundation. Such leaks, they reasoned, could be causing expansion of the clay soil under the rear of the house. Initial testing indicated that there was a significant leak in the plumbing system.

Realizing for the first time that their homeowners' policy might cover their foundation problems, the Nicolaus filed a claim with State Farm in February 1990. State Farm referred the claim to Monty R. Murray, an adjuster with ABJ Adjusters, Inc. Murray provided an initial report to State Farm in late February 1990 and a second report in March. Both reports expressed doubts that the leak was responsible for the foundation damages, because the leak was located toward the front rather than the back of the house.

In late March, at Krismer's request, Maverick Engineering provided the Nicolaus with a report based on its investigation and testing. The Nicolaus gave the report to Ralph Cooper, State Farm's claims superintendent. The report stated that the water from the plumbing leak may have flowed along the plumbing lines and trenches and may have caused the rear of the house to heave.

After receiving the Maverick report, Cooper, on behalf of State Farm, notified the Nicolaus that he wanted to obtain a second opinion on the origin and extent of their damages. For that purpose, Cooper authorized ABJ Adjusters to obtain a report from Haag Engineering Company.

Two Haag engineers examined the Nicolaus' house. They provided Cooper with a report concluding that the reported sewer line leak did not significantly affect the foundation. Cooper forwarded the report to the Nicolaus, together with a letter reserving State Farm's rights to deny coverage.

A month later, after receiving an estimate from Michael Krismer, State Farm notified the Nicolaus that State Farm was denying

most of the coverage sought. State Farm did reimburse the Nicolaus $1,820.50 for expenses incurred in locating and repairing the leak, but rejected the Nicolaus' claim for $102,200 for further piering or leveling of the foundation. Cooper explained in a letter that State Farm felt the Haag Engineering report was correct: that the foundation damage was not related to the water leak but was instead caused by inherent vice or by settling problems, both of which were not covered.

The Nicolaus then obtained a report from Trinity Engineering Testing Corporation (Tetco) prepared by Chien Fu, a licensed professional engineer with a master's degree in geotechnical engineering specializing in soils analysis and foundation reports. Based on soil samples taken at the house, Fu concluded that the plumbing leak had allowed water to travel great distances through the cushion sand layer, causing a widespread wet condition in the soils. The Nicolaus forwarded the Tetco report to Cooper.

Cooper then notified the Nicolaus that he and Haag Engineering had reviewed the Tetco materials. The Haag engineers had reported that Tetco's conclusions were unfounded, and that the opinions stated in Haag's initial report remained unchanged. Cooper agreed with Haag and stated that State Farm was adhering to its denial of the Nicolaus' claim.

The Nicolaus then sued State Farm, asserting breach of contract and several extra-contractual claims based on State Farm's conduct. At trial, the jury found that State Farm had breached its insurance contract, engaged in an unfair or deceptive act or practice, maliciously breached its duty to deal fairly and in good faith, and knowingly engaged in an unconscionable action. The jury awarded the Nicolaus $102,200 in policy benefits owed for necessary repairs to their home; $50,000 for mental anguish suffered in the past; $300,000 in punitive damages; and attorney's fees of either forty percent or $150,000.

The trial court chose to disregard all of the jury's findings except those relating to breach of contract, amount of loss, and attorney's fees. After subtracting the amount State Farm had already paid for plumbing

repairs, the trial court rendered judgment for the Nicolaus for $100,380, plus attorney's fees and interest.

The court of appeals affirmed the trial court's judgment on the breach of contract finding. 869 S.W.2d at 555. However, in all other respects, the court of appeals reversed the trial court's judgment and rendered judgment for the Nicolaus in accordance with the jury's findings. *Id.*

## I. Bad faith

■ In an opinion also issued today, we clarified the standard for imposing liability for a breach of the duty of good faith and fair dealing. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 54 (Tex.1997). We held in *Giles* that an insurer breaches its duty when the insurer fails to settle a claim if the insurer knew or should have known that it was reasonably clear that the claim was covered. *Giles,* 950 S.W.2d at 56. This case was submitted in accordance with the bad-faith standard established in *Arnold v. National County Mutual Fire Insurance Co.,* 725 S.W.2d 165 (Tex.1987). Under *Arnold,* an insurer breaches its duty of good faith and fair dealing if the insurer denies a claim with no reasonable basis. *Id.* at 167. There is some evidence in the record in this case to sustain a bad-faith finding under either formulation of the standard.

■ Here, State Farm argues that the Haag Engineering reports conclusively establish that it did not act in bad faith in denying the Nicolaus' claim. Those reports, prepared by licensed engineers, conclude that a water leak did not cause the damage to the Nicolaus' foundation. Because State Farm based its denial on these reports in the dispute over coverage of the Nicolaus' claim, State Farm argues that any liability for bad faith is foreclosed as a matter of law.

We have recognized that evidence showing only a bona fide coverage dispute does not, standing alone, demonstrate bad faith. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994) citing *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376–77 (Tex.1994). But we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law. Instead, we have repeatedly acknowledged that an insurer's reliance upon an expert's report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. *Lyons v. Millers Casualty Ins. Co.,* 866 S.W.2d 597, 601 (Tex. 1993); *Dominguez,* 873 S.W.2d at 377.

Courts of appeals have likewise held, in similar circumstances, that evidence casting doubt on the reliability of the insurer's expert's opinions may support a bad-faith finding. *See State Farm Fire and Cas. Co. v. Price,* 845 S.W.2d 427, 436–38 (Tex.App.— Amarillo 1992, writ dism'd by agr.); *Guajardo v. Liberty Mut. Ins. Co.,* 831 S.W.2d 358, 364–65 (Tex.App.—Corpus Christi 1992, writ denied).

In this case, the Nicolaus presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual. Accordingly, there is some evidence that State Farm denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear. *See Giles,* 950 S.W.2d at 56; *Lyons,* 866 S.W.2d at 601. David Teasdale, a Haag engineer since his graduation from college in 1985, provided evidence that a substantial amount of Haag's work is done for insurance companies; Teasdale estimated that eighty to ninety percent of his work consisted of investigations for insurance companies. He also testified that he was aware that an insurance company would be required to pay if a policyholder's home were damaged by a leak.

Furthermore, the evidence supports a logical inference that State Farm obtained the reports from Haag Engineering because of Haag's general view that plumbing leaks are unlikely to cause foundation damage. State Farm's claim superintendent, Ralph Cooper, testified that he was aware of Haag's view when he requested the first report:

Q: Okay. Did you know that Haag had a general opinion about leaks underneath houses?

. . . .

A: I knew that they were of the general opinion that a localized leak beneath the house would not cause foundation damage as a general rule. Sometimes they felt it would, sometimes they felt it wouldn't.

Q: And you knew that before you hired Haag?

A: Yes, I did.

Cooper's testimony was reinforced by Savannah Robinson, the Nicolaus' attorney, who initially testified only about attorney's fees. Under cross-examination, Robinson acknowledged that she had occasionally represented State Farm in the past. Robinson testified without objection that it was a "fair inference" that Cooper, whom she knew, hired Haag because he was aware that Haag, as a general rule, would not agree that a leak caused foundation damage.

Standing alone, this evidence would not always be evidence of bad faith. All experts presumably have certain general views and expertise, and an insurer's mere awareness of such views is not necessarily an indication of bad faith. Taken together with the evidence outlined below, however, it does provide more than a scintilla of evidence from which the jury could logically infer that State Farm did not reasonably rely on Haag's report to deny the Nicolaus' claim.

The Nicolaus' foundation repair contractor, Krismer, testified that he had reviewed eighty or ninety Haag reports in the local area. He knew of only two instances in which a Haag report concluded that a leak contributed to foundation movement. He further testified that, to his knowledge, neither of the two Haag engineers who reached that conclusion ever again worked on another case involving a slab foundation like the Nicolaus'.[1]

Krismer's testimony was corroborated by Robinson. Robinson testified that she was aware of only two instances in which Haag engineers had attributed foundation damage to a leak and that "the engineers who wrote those reports were never seen from [sic] again."

There was also evidence that State Farm, and the engineers on which it relied, did not conduct an adequate investigation. Krismer testified that the Haag report was based on inadequate information. He said the failure of State Farm and Haag Engineering to examine the leaking pipe, take core samples, and perform other tests was unreasonable. Brock Thomas, a licensed insurance adjustor, testified about an insurer's obligations when presented with a claim. He offered his opinion that State Farm was obligated to fully investigate the claim and that the company had not done so. Thomas agreed that the investigators should have examined the leak and taken soil samples. Moreover, Cooper admitted that the Haag engineers had not seen the leaking pipe or taken any soil samples when they concluded that the leak did not cause the foundation damage. He also admitted that he did not contact Maverick Engineering to obtain further information after Maverick concluded that the leak may have caused the foundation damage.

Some evidence also indicates that State Farm knew, when it denied the Nicolaus' claim for the second time, that the Haag report did not justify denying the claim. The Tetco report, which the Nicolaus provided to State Farm after State Farm initially denied the claim, discussed the moisture content of soil samples taken from four locations within the Nicolaus' house. State Farm referred the Tetco report, which had found that water from the leak had spread throughout the soils underlying the Nicolaus' foundation, to the same Haag engineers who had prepared the initial report. There is no indication that the Haag engineers did any further testing in response to the Tetco report or that State Farm conducted any further investigation before denying the claim a second time.

---

1. The testimony of Krismer cited by the dissent is consistent with this evidence. Krismer acknowledged that two Haag engineers had found that a leak had caused foundation damage; thus, his testimony that it would not be true to say that "Haag only . . . finds that there's no relation between the leak and foundation movement" is not surprising.

Other evidence also called into question the accuracy of the Haag reports on which State Farm relied. The second Haag report asserted that the soil moisture content discussed in the Tetco report should not be considered high. Three of the Nicolaus' experts strongly disagreed with this conclusion, and even State Farm's own expert, Frelon Wiley, testified that he disagreed with it. The Haag report also suggested that the water Tetco's engineer had observed—which had flowed upward through a hole in the foundation for three to five minutes—could be explained as condensation that had accumulated naturally. Krismer testified that this suggestion was "the most ridiculous thing I've ever heard." Thomas Petrie, an expert called by State Farm, agreed that the suggestion was unreasonable.

Were we the trier of fact in this case, we may well have concluded that State Farm did not act in bad faith. That determination is not ours to make, however. Instead, the Constitution allocates that task to the jury and prohibits us from reweighing the evidence, as the dissent does. *See* TEX. CONST. art. I, § 15 and art. V, § 10; art. V, § 6. Accordingly, viewing the evidence in the light most favorable to the Nicolaus, we hold that there is some evidence to support the jury's finding that State Farm denied the Nicolaus' claim in bad faith.

## II. Malice

■ State Farm also argues that the court of appeals erred by reinstating the jury's malice finding, because there is no evidence that State Farm's conduct had a reasonable probability to result in human death, great bodily harm, or property damage. We agree.

When the parties tried this case, the statutory definition of "malice" included the following:

(A) conduct that is specifically intended by the defendant to cause substantial injury to the claimant; or

(B) conduct that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm, or property damage.

TEX. CIV. PRAC. & REM.CODE § 41.001(6).[2] The instruction accompanying the "malice" question in this case tracked part (B) of the statutory definition. The Nicolaus did not object to the omission of any language from part (A) and have not made any such complaint on appeal. Nor have the Nicolaus suggested that State Farm's conduct was likely to result in human death or great bodily harm. Thus, to establish malice, the Nicolaus had to present evidence that State Farm was actually aware that its conduct would, in reasonable probability, result in property damage.

In support of the jury's finding, the Nicolaus point out that they were greatly inconvenienced by living with a hole in the hallway of their home for over five months. The Nicolaus' homeowners' policy provided for "additional living expenses" if the house became unlivable due to a covered loss, but the Nicolaus assert that State Farm never brought this provision to their attention. The fact that State Farm did not advise the Nicolaus that they might be entitled to additional living expenses is no evidence, however, that State Farm's denial of the Nicolaus' foundation damage claim caused or threatened to cause property damage to the Nicolaus' home.

The Nicolaus also assert that State Farm's conduct forestalled any effort to make permanent repairs to the foundation, resulting in a significant loss in the house's property value. But the damage to the Nicolaus' foundation was caused by a plumbing leak, which State Farm paid to repair. There is no evidence that State Farm's denial of the Nicolaus' foundation damage claim caused any additional property damage once the leak was repaired. The Nicolaus cite no other

---

2. We note that the Legislature revised this definition in the last legislative session, and changed the paragraph number from (6) to (7). *See* Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109. Preexisting law governs suits filed before the Act's effective date. *Id.*, § 2, at 113.

evidence that establishes that State Farm's denial of the claim caused or threatened to cause property damage. Therefore, under the plain language of section 41.001(6)(B), the malice finding cannot stand.

### III.  Unconscionability

■ In addition to finding that State Farm acted with malice, the jury also found that State Farm knowingly engaged in an unfair or deceptive act or practice, as well as an unconscionable action or course of action. These findings, if supported by evidence, would allow the Nicolaus to recover additional damages under section 17.50 of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), TEX. BUS. & . COM.CODE §§ 17.41–.63.

The only DTPA findings the court of appeals reached were the findings that State Farm engaged in unconscionable conduct that was a producing cause of damages to the Nicolaus. The court of appeals upheld these findings, reasoning that there was a gross disparity between the premiums the Nicolaus paid and the value they received. 869 S.W.2d at 554. State Farm argues that the court of appeals erred in reinstating the findings because there is no evidence that State Farm acted unconscionably. We agree.

The DTPA defines unconscionable action as

an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX. BUS. & COM.CODE § 17.45(5). We have previously held that the term "gross," as used in this section, means "glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex.1985).

In support of the jury's findings, the Nicolaus rely on testimony from Mr. Nicolau that State Farm *should have* conducted a more thorough investigation and *should have* told him about the insurance policy's provision for additional living expenses. The record, however, provides no support for the conclusion that State Farm took advantage of the Nicolaus to a grossly unfair degree. Mr. Nicolau testified that he was aware of the policy's provisions about foundation settlement and leaks when the claim was first made. Additionally, as mentioned previously, State Farm agreed to pay for the Nicolaus' plumbing repairs. State Farm also agreed to pay for the tests the Nicolaus arranged, including the report provided by Maverick Engineering and the plumbing tests. Considering this evidence, as well as the continual exchange of information between State Farm and the Nicolaus, there is no basis for concluding that State Farm took advantage of the Nicolaus to the degree that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated.

There is also no evidence that State Farm acted unconscionably because of an act that resulted in a gross disparity between the value the Nicolaus received and the consideration they paid. Although State Farm refused to pay the Nicolaus' claim for foundation repairs, it did pay for the plumbing repairs and investigative costs after the leak was discovered. There is no evidence that the disparity between what the Nicolaus paid for insurance and the amounts they received under the policy was "glaringly noticeable, flagrant, complete and unmitigated." *Chastain,* 700 S.W.2d at 583.

### IV.  Jury charge

■ State Farm next argues that the trial court reversibly erred in submitting the breach of contract question to the jury, because the court's charge did not include instructions about the specific terms of the insurance contract. We disagree.

Rule 277 of the Texas Rules of Civil Procedure requires a trial court to submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." This rule, we have recognized, affords the trial court considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. *Mobil*

*Chem. Co. v. Bell,* 517 S.W.2d 245, 256 (Tex. 1974).

Here, the trial court refused the instruction only after confirming that the policy itself was in evidence. Other circumstances also indicated that additional instructions were unnecessary. The relevant exclusions were presented to the jury in an exhibit and were discussed at length. Moreover, there was no dispute about the meaning of the policy's terms; State Farm's own claims superintendent acknowledged that the Nicolaus' policy would cover any foundation settlement caused by a plumbing leak.

The jury's findings demonstrate that its understanding of the policy was consistent with State Farm's explanation of the policy's terms. The jury found, in its answer to question 8A, that plumbing leakage caused $102,200 in damages to the Nicolaus' home. The jury also found, in its answer to question 8(a), that State Farm owed the Nicolaus policy benefits of $102,200 for necessary repairs to their home.

We conclude, therefore, that the trial court did not abuse its discretion by refusing the instruction.

## V. Remand for consideration of new evidence

At trial, State Farm interrupted the presentation of its evidence with a motion based on newly discovered evidence. Outside the presence of the jury, State Farm informed the court that additional plumbing tests had just been completed at the Nicolaus' house, resulting in the discovery of another large leak. State Farm requested that the trial court either stay the proceedings to allow additional testing or declare a mistrial. The trial court did not grant the motion. Instead, the court proceeded with the trial after receiving assurances from the Nicolaus' counsel that she would instruct their witnesses not to mention the new testing, and

that she would not use the exclusion of the new evidence as a basis for appeal.

After the trial court rendered its judgment, State Farm moved for a new trial on the basis of the new evidence. The trial court declined to rule on this issue on the basis of Rule 324(c) of the Texas Rules of Civil Procedure, which allows postponement of an evidentiary hearing until after remand from an appellate court.[3]

State Farm now argues that the court of appeals erred in failing to remand this case for consideration of the motion for new trial based on the new evidence. We disagree, because State Farm has not shown any likelihood that the new evidence, if introduced at trial, would have resulted in a different verdict on any of the Nicolaus' claims.

On the issue of contractual liability, the evidence tends to provide additional support for the jury's finding that State Farm breached the insurance contract. The Nicolaus' policy undisputedly provides coverage for damage caused by plumbing leaks, so the existence of an additional leak only strengthens the Nicolaus' claim for coverage.

Likewise, on the issue of bad faith, the evidence tends to lend additional support to the jury's determination that State Farm breached its duty of good faith and fair dealing. At least two of the Nicolaus' witnesses testified that State Farm should have conducted further testing, such as taking soil samples, before concluding that the foundation damage was not caused by plumbing leaks. The Nicolaus' witnesses also criticized State Farm's conclusion, based on the Haag engineers' second report, that the moisture levels below the house should not be considered abnormally high. The new evidence supports the Nicolaus' position in both respects: it suggests that additional testing might well have established that the foundation damage was a covered loss and that the moisture levels were abnormally high.

---

3. The rule applies to a judgment *non obstante veredicto* or notwithstanding the findings of a jury on one or more questions, and provides in part:

> The failure to bring forward by cross-points such grounds as would vitiate the verdict shall be deemed a waiver thereof; provided, however-

er, that if a cross-point is upon a ground which requires the taking of evidence in addition to that adduced upon the trial of the cause, it is not necessary that the evidentiary hearing be held until after the appellate court determines that the cause be remanded to consider such a cross-point.

We hold, therefore, that any error in the trial court's action probably did not result in the rendition of an improper judgment, and thus is not reversible. *See* TEX.R.APP. P. 81(b)(1).

\* \* \*

We conclude that the Nicolaus should recover on their bad faith claim. Because no evidence supports the jury's finding of malice, however, the Nicolaus should not recover exemplary damages on that basis.

The Nicolaus may nonetheless be entitled to recover additional damages based on the jury's findings that State Farm knowingly engaged in unfair or deceptive acts or practices. *See* TEX. BUS. & . COM.CODE § 17.50. Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and remand this cause to that court for review of these findings in light of State Farm's previously asserted reply points and cross-points, which include factual insufficiency arguments.[4]

ENOCH, J., filed a concurring opinion.

HECHT, J., joined by PHILLIPS, C.J., GONZALEZ and OWEN, JJ., filed a dissenting opinion.

ENOCH, Justice, concurring.

The Nicolaus presented evidence before the factfinder that challenged the reliability of the information used by State Farm to deny their claim. It is this evidence that the Court reviewed in concluding that there is some evidence to support the jury verdict of bad faith. I agree with the Court's review and its conclusion. Consequently, I join in the Court's opinion.

I write separately to note that, for the reasons explained in my concurring opinion in *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 78 (Tex.1997) (Enoch, J., concurring), I believe that the key to the proper resolution of both this case and *Giles* lies in application of the principles we enunciated in *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597 (Tex.

1993), and *National Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373 (Tex.1994). The Court in *Giles* announces a "modification" to the bad faith standard of liability. While I adhere to my view that such a modification was neither warranted nor particularly meaningful, my view did not prevail. Even so, the Court's opinion in this case reflects the continuing vitality of *Lyons* and *Dominguez*.

HECHT, Justice, joined by PHILLIPS, Chief Justice, in all but Part I, and by GONZALEZ and OWEN, Justices, dissenting.

I do not agree that State Farm Lloyds committed a tort against Ioan and Liana Nicolau. I therefore respectfully dissent.

**I**

The Texas tort of bad faith is—to borrow Judge Alex Kozinski's observation in a related context—"so nebulous in outline and so unpredictable in application that it more resembles a brick thrown from a third story window than a rule of law." *Oki America, Inc. v. Microtech International, Inc.*, 872 F.2d 312, 315 (9th Cir.1989)(Kozinski, J., concurring, referring to the tort of bad faith denial of contract created and then abolished by the California Supreme Court, *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995), *overruling Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984)). The only flaw in Judge Kozinski's metaphor is the implication that bad faith liability is limited to hapless passersby. A more accurate comparison would be to an assault weapon fired into a crowd at random.

That, needless to say, is the defendants' perspective. For plaintiffs, bad faith is more like Hollywood television's Wheel of Fortune, or closer to home, like the Texas lottery: it costs almost nothing to play, you can play whenever you want, and if you win you hit the jackpot—tens, maybe hundreds, of thousands of dollars for the awful mental anguish

---

4. Because the court of appeals' decision may affect the amount of damages awarded, as well as the award of attorney's fees, we do not reach

State Farm's argument that the court of appeals erred by awarding attorney's fees on the entire amount of damages found by the jury.

that invariably seems to accompany denial of even the smallest insurance claim, and millions in punitive damages. And like the lottery, bad faith liability is paid ultimately by the public. Insurance companies have not been authorized to print their own currency; the money to pay successful plaintiffs and their attorneys comes from policyholders, and they obtain the money to pay premiums from wages or sales. In effect, bad faith is a levy on everyone to benefit a few—what some have called a tort tax.

But whether bad faith is seen from the recovery end or the liability end, its principal feature is the same: it is chancy, far more so than any rule of law ought to be. A legal cause of action should not be a game of roulette, either casino-style or the Russian variety. Individuals and entities, even insurance companies, are entitled to know before they act what the law expects of them, what behavior is culpable and what is not. A legal cause of action must be adequately defined by principles and standards. The bad faith tort for first-party insurance relationships in Texas does not approach minimum requirements.

This is not a small problem. Every lawsuit in Texas by an insured against an insurer almost always includes an allegation of bad faith—at least every one filed by a competent lawyer. Why? Is it because the insurers who venture to do business in this State are a uniformly sorry lot? No; it is because the odds of recovery are always decent and the stakes—unlimited tort liability—are always high. The threat of liability also increases the settlement value of any policy claim and may make settlement less likely. Why is the threat viable in every case filed? Because this Court will not define the limits of the tort.

Until today the Court defined the tort in a single sentence: "[A]n insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact." *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 18 (Tex.1994); *Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). *Accord Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 340 (Tex.1995); *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 283 (Tex.1994). Like any general principle, it requires working out in actual cases. Dozens of cases in the courts of appeals over the past ten years have begged for further guidance. One court even went so far as to write of a sister court's decision, "[t]his is not only dangerous precedent, it is frightening precedent." *State Farm Fire & Cas. Co. v. Simmons,* 857 S.W.2d 126, 135 (Tex.App.—Beaumont 1993, writ granted)(referring to *State Farm Lloyds, Inc. v. Polasek,* 847 S.W.2d 279 (Tex. App.—San Antonio 1992, writ denied)). This conflict should be resolved; instead, the Court adds to the confusion.

The Court is not oblivious to the problems with bad faith. For example, it has recognized almost from the beginning that not every erroneous denial of an insurance claim can be bad faith. More precisely, the Court *promised* in *Aranda* that an insurer "*will not* be subject to liability for an erroneous denial of a claim." *Aranda,* 748 S.W.2d at 213 (emphasis added). There is, however, a catch, as today's decision illustrates: an insurer will not be liable *unless* someone, anyone—*even the insured's own trial lawyer*—will testify that it acted unreasonably. If at least one witness will testify that there was no reasonable basis for an insurer's denial of a claim, and the jury agrees, an insurer *will* be subject to bad faith liability. As such evidence is not hard to come by—the witness need not be specially qualified, and plaintiff can testify himself if his lawyer is for some reason indisposed—the promise of *Aranda* means no more than that an insurer will never be liable unless a jury finds it liable. This is not much of a promise. It is not very helpful as a rule of law.

In *Moriel* the Court offered another palliative: "A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith." *Moriel,* 879 S.W.2d at 18. Again, there is a catch, as today's decision illustrates: a simple disagreement among experts does not prove bad faith *unless* the insured's expert or the insured's

lawyer says the insurer's expert was unreasonable. If the insured's witness testifies only that the insurer's expert was wrong, not that he was unreasonable, then the insurer cannot be liable for bad faith. Desperate indeed will be the plaintiff whose expert or trial counsel will testify that a contrary opinion was wrong but cannot be coaxed to add that it unreasonable.

The Court's rationalizations are approaching doublespeak. The Court writes that "evidence showing only a bona fide coverage dispute does not, standing alone, demonstrate bad faith." *Ante* at 448. I should have thought it obvious that evidence of a bona fide dispute is no evidence of bad faith. How can such evidence, "standing" with other evidence, "demonstrate bad faith"? It is like saying that evidence of no negligence cannot, standing alone, prove negligence. The Court's position may be accurately summarized as follows: evidence that a claims dispute was in good faith does not preclude a finding of bad faith, although such evidence never proves bad faith, except in some circumstances, such as when the factfinder finds bad faith, unless the factfinder is wrong. Is it any wonder that one court of appeals has drily observed that this Court "has ultimately done little to provide lower courts with any guidance for conducting a legal sufficiency review" in bad faith cases? *Columbia Universal Life Ins. Co. v. Miles,* 923 S.W.2d 803, 810 (Tex.App.—El Paso 1996, writ denied).

I am not in favor of abolishing the tort of bad faith, although I would not have been in favor of creating it. The experience in Texas and throughout the country persuades me that the law should afford some private right of recovery of consequential damages to insureds whose claims have been wrongfully denied or delayed, but I would have preferred to derive that right from established principles of contract law, or to have relied on statutory remedies, rather than to create a new tort and, like Dr. Frankenstein, take our chances. That point of decision is long past for most American jurisdictions. About half the states recognize a bad faith tort in first-party insurance cases. Although the contract route certainly looks far more attractive now than it did when the law was at the crossroads, we are so far down the tort road it would be hard to retrace our steps.

Having decided to create a new tort, it is this Court's firm responsibility to infuse it with the principles, logic and limits necessary for any rule of law. Bad faith, no less than breach of contract or negligence or any other cause of action, must be defined to balance all the interests involved and provide logical, predictable standards of culpability. Unscrupulous insurers are not the only problem. Insurance companies have not cornered the market on greed and dishonesty; insurance fraud costs billions of dollars a year. A just and workable legal right can distinguish, with acceptable degrees of certainty and predictability, between insurance claims abuse on both sides and legitimate differences of opinion. The bad faith tort in Texas does not meet this standard, and it is the Court's fault.

Today's decision in *Universe Life Insurance Co. v. Giles,* 950 S.W.2d 48 (Tex.1997), changing the liability standard from "no reasonable basis" to "reasonably certain", does nothing to define the tort. The Court correctly states in that case and this one that the result in each would be the same under either standard. That is true. In fact, the result would be the same under either standard in any case imaginable. The sole reason for changing the liability standard is to align the common law with article 21.21, § 4(10) of the Insurance Code. The Court is unable to point to a case that would be affected by the change in liability standard. .

The Court cannot simply stand by and hope that juries will do justice when we cannot define for them what justice means. Juries are entitled to be told what the law is. They cannot be expected to fulfill their function as factfinders until the court gives them the applicable law. I doubt the Court would approve of the Insurance Commissioner, experienced in the conduct of the insurance business, routinely handing out $50,000 fines to insurers with no more legal and factual basis than exists in this case. A standardless decision is no better because a jury makes it.

This Court's only responsible alternatives in this case were to begin to define the tort of bad faith or to abolish it. While I am not yet in favor of the latter, I am absolutely against adding rationalizations to generalizations.

## II

### A

For State Farm to have acted in bad faith, its denial of the Nicolaus' claim must not only have been in error; its denial of the claim must have been without any reasonable basis. There should be some indication that State Farm was an "unscrupulous insurer[ ] [taking] advantage of [its] insureds' misfortunes in bargaining for settlement or resolution of claims." *Arnold*, 725 S.W.2d at 167.

If ever there were a dispute about an insurance claim over which reasonable minds could differ, this is it. Five years it took the Nicolaus, consulting with experts and making repairs, before they themselves came to believe that the shifting in the foundation of their home was caused by a leak in the sewer line beneath the family bathroom—and thus covered by their homeowner's policy. State Farm relied on two highly qualified engineers employed by a firm with long-established, worldwide business to conclude that the shifting was caused by the nature of the clay soil where the house was built (which also caused problems in a great many other homes in the Nicolaus' neighborhood), atmospheric conditions, and the way in which the foundation had been constructed—and thus not covered by the policy. At trial, two engineers, a general contractor, a foundation contractor and two plumbers testified for the Nicolaus; five engineers testified for State Farm—three from firms other than the one hired to investigate the claim, and one of them hired as a trial witness by the Nicolaus. The trial lasted five days. The transcript of proceedings is over 1,200 pages long. By any fair measure, the disagreement over what caused the shifting in the foundation of the Nicolaus' house was serious and substantive.

Given such a disagreement, where does the Court find evidence to suggest not only that

State Farm should have paid the Nicolaus' claim but that it had no reasonable basis for doing anything else? The answer is, not in the totality of circumstances, but in a few sentences of testimony by plaintiffs' hired experts and by the Nicolaus' own trial counsel. It should come as no surprise that some of the experts called to testify by the Nicolaus believed that they were right about the leak in the sewer drain causing the Nicolaus' problems, and that there was no reasonable basis for anyone to think otherwise. Indeed, it is awfully hard to prove a case of bad faith with witnesses who think there is room for reasonable disagreement. It should come as even less surprise that the Nicolaus' lawyer thought that State Farm's refusal to pay their claim was unreasonable. What *is* surprising, especially after *Moriel, National Union Fire Insurance Co. v. Dominguez*, 873 S.W.2d 373 (Tex.1994), and *Lyons v. Millers Casualty Insurance Co.*, 866 S.W.2d 597 (Tex.1993), is that liability for bad faith can rest on no more evidence than exists in this case. If all it takes to support a claim for bad faith is for a witness professing expertise or the plaintiff's lawyer to opine that an insurer had no reasonable basis for acting as it did, then few will be the cases with no evidence to support the claim. Such opinions are not hard to procure. No-evidence review in bad faith cases becomes no-review review. That is the result of today's decision, as the facts of the case show.

### B

Cracks began to form in the interior and exterior walls of Ioan and Liana Nicolau's Corpus Christi home in 1984, some six years after they moved in and ten years after the house was built. They suspected foundation problems as the cause. Many homes in Corpus Christi have foundation problems because of the Beaumont clay soil, although the number of houses with problems in the Nicolaus' subdivision was abnormally high.

The Nicolaus insured their home with State Farm Lloyds. Their policy does not cover damage resulting from shifting in the foundation, unless the shifting is caused by a plumbing leak.

The Nicolaus hired Thomas Krismer, a foundation repair contractor in business about three years, to stop the cracking in the walls of their home. On Krismer's recommendation, the Nicolaus also hired Dexter Bacon, an engineer with a local company, Maverick Engineering. Krismer and Bacon inspected the Nicolaus' home and concluded that the problems were due to four mesquite trees in the front yard that were desiccating the area in front of the house, causing the soil there to shrink and the foundation to subside. On Bacon's advice, the Nicolaus paid Krismer to install piers along the front of their foundation to prevent further settling and damage to the house.

The piers Krismer installed did not stop the cracking and shifting in the house. In 1986 the Nicolaus called Krismer back again. This time he told them that the cracks that were continuing to appear in their home were normal. In 1988 the Nicolaus called Krismer a third time. He again recommended that Bacon be consulted. Bacon reported to the Nicolaus that the persistent cracking was due to a drought that was causing some minor deflection in the piers that had been installed.

It must be noted at this point that from 1984 to 1989 Krismer and Bacon never took core samples of the soil around the house, or checked for plumbing leaks, or examined the foundation to see whether it had been constructed properly. The significance of this fact is that these are the very things that the Nicolaus' trial experts, including Krismer and Maverick Engineering's representative, criticized State Farm's experts at Haag Engineering for not doing. Krismer testified that his approach was justified. In 1984, he said, the Nicolaus' foundation was sinking, not heaving as it might have been if there had been a plumbing leak. In other words, Krismer did not think that a leak could have caused the problems he observed. Similarly, Haag did not think that a leak under one part of the foundation could cause the opposite side of the foundation, some thirty feet away, to shift. Krismer also testified that many of the homes on the Nicolaus' street had similar problems, suggesting common causes, such as soil and drought, rather than causes more likely to be unique to one house, such as a leak or faulty construction. Haag also thought the most likely causes of the Nicolaus' problems were natural. In short, for five years Krismer and Bacon believed that it was unnecessary to take core samples, look for leaks, or examine the construction of the foundation because the most likely cause of the shifting were weather and soil. No one suggests that Krismer and Bacon were incompetent or biased, or that they acted in bad faith. It is equally difficult, however, to level the same charges at Haag. As Krismer testified, "foundations are very complex things".

In 1989 the Nicolaus consulted a different expert, Gerald Pascador, before calling Krismer back for the fourth time. While inspecting the house, Krismer found a leak in the master bedroom shower that he thought might somehow be causing problems. Following Krismer's advice, the Nicolaus fixed the leak, but still the cracking in their home worsened. Krismer continued to consult with Bacon, but because Bacon had left Maverick Engineering's employ, Krismer contacted another Maverick engineer, Fred Hayden. Hayden had a bachelor's degree in general engineering from Texas A & I University and had become manager of Maverick after working for the company for eighteen years. He had experience in designing foundations and investigating problems in them.

Hayden suggested that instead of the front of the house settling, the back might be heaving due to another leak under the house that was causing the soil toward the sides or rear of the foundation to swell. At Hayden's direction, Reed Glendenning, a plumber for fifteen years and business partner of Krismer's, tested the sewer line in early 1990. This line carried waste water, *not under pressure*, from drains in the house to the sewer. Glendenning found that the line was leaking in the vicinity of the hall bathroom, near the center on one side of the house, marked by the "x" in the following rough schematic.

back

front

A few days after this discovery, in February 1990, the Nicolaus filed a claim on their homeowners' policy with State Farm.

About a month later, Hayden provided the Nicolaus a written report of his investigation. Although the leak still had not been located precisely, it appeared that it would be nearer the center of the house and not toward the side and rear where the foundation appeared to be shifting. Still, Hayden theorized in his report "that the extremely wet condition of the soils on the left side of the residence *may have caused* the water from the plumbing leak to leak along the plumbing lines and trenches and *may have caused* the kitchen area to heave as well". (Emphasis added.) However, Hayden and Maverick Engineering remained uncertain whether the leak *actually was causing* the shifting in the foundation.

Meanwhile, State Farm's superintendent, Ralph Cooper, contacted Haag Engineering to investigate the Nicolaus' claim. Haag had been in business since 1924 and employed about twenty engineers in all disciplines. Haag had offices in Dallas, Houston, and Corpus Christi, and clients around the world. Haag often worked for insurance companies. Haag assigned two engineers to the project: Jim Wiethorn, who had a bachelor's degree

from Baylor University in math and physics, and a master's degree, cum laude, from the University of Texas in architectural engineering; and David Teasdale, who had bachelor's and master's degrees from the University of Texas in civil engineering. Wiethorn and Teasdale both specialized in failures in various kinds of structures, and Teasdale also specialized in problems with soils.

The Nicolaus argue that State Farm never intended to pay their claim and hired Haag to supply the expert opinion it could use as a pretext. The Justices who comprise the today's majority accept this argument. There is no evidence—not even from the Nicolaus' expert witnesses—to support it.

At trial, Cooper testified that he knew before he hired Haag "that they were of the general opinion that a localized leak beneath the house would not cause foundation damage as a general rule. Sometimes they felt it would, sometimes they felt it wouldn't." Wiethorn and Teasdale relied on a published study by the University of Texas at Arlington which concluded that localized leaks in an unpressurized sewer line under a slab foundation rarely caused significant shifting. They had also developed, in consultation with

members of the engineering faculties at the University of Texas and Texas A & M University, a set of criteria for assessing the effects of an unpressurized sewer leak on a slab foundation. Following these criteria, Haag engineers in general, and Wiethorn and Teasdale in particular, rarely found that sewer leaks caused foundation problems. Krismer testified that he knew of only one instance in which any Haag engineer (not Wiethorn or Teasdale) had reached a different conclusion.

Still, Krismer also testified that while he knew the Haag engineers relied on the UT–Arlington report, it would not be true to say that State Farm hired Haag simply to get an opinion that a leak beneath a house did not cause foundation problems. Cooper testified: "I hire Haag because to me they're the IBM of the engineering profession. They do work worldwide. They have studies in this area. They're well-respected. They've been all over the country, and they're one of the leading engineering firms of the country, and I rely on them as an expert." While some of the Nicolaus' experts at trial were critical of the conclusions Wiethorn and Teasdale reached and the manner in which they performed their work, no one disputed their credentials or expertise, or Haag's reputation, and no one accused them of being biased against the Nicolaus or of having preconceived ideas about the validity of their specific claim. Krismer expressly refuted the accusation when he testified:

Q   If somebody were to say that State Farm hires Haag, and Haag only—

A   That's not—

Q   —finds that there's no relation between the leak and foundation movement, that would not be true, would it?

A   No, that would not be true.

Wiethorn and Teasdale examined the Nicolaus' home in April 1990. At that time, the leak still had not been found, but Hayden had knocked a hole in the foundation near the hall bathroom and found the clay soil there extremely wet. The Haag engineers looked at cracks in the exterior and interior of the home and examined the hole Hayden had made in the foundation. Wiethorn and Teasdale thought it unnecessary to try to uncover the leak as they were willing to assume from Glendenning's test the existence, nature and general location of the leak. After reviewing all the work that Krismer, Bacon, Hayden and Glendenning had already done, Wiethorn and Teasdale concluded in May 1990 that the leak could not be causing the shifting in the foundation of the Nicolaus' home.

The Haag engineers reached their conclusion for several reasons. First, since the sewer line was not pressurized and was embedded in the clay soil beneath the house, the amount of water that could escape was minimal. As it turned out, there was a small air pocket in the soil at the point of the leak, but Haag eventually concluded that it did not allow significantly more water to flow from the leak. Second, Wiethorn and Teasdale did not believe that water leaking from an unpressurized line in the middle of the house could migrate to the back of the foundation where much of the shifting had occurred. The only possible conduit suggested for this migration, other than for the water to seep through the soil in all directions, was the plumbing trench that had been dug and re-filled when the house was built. The Haag engineers did not believe that the soil where the trench had been, or the elevation of the area (the lot sloped upward from the front), would allow water to move along that area. Also, Haag saw no evidence of shifting in the foundation near the trench area as there should have been if it were moist from the leak. Third, there was no other way to connect the shifting near the edges of the foundation with a sewer leak in the center of the house. Finally, given the abnormal number of problems with other houses in the same area and the nature of the soil on which those houses were built, the Haag engineers concluded—as the Nicolaus and their experts had thought for five years—that the foundation problems were due to natural causes.

Based on the Haag engineers' report, State Farm advised the Nicolaus in May 1990 that, although its investigation was continuing, it was possible their claim would not be covered by their policy. The Nicolaus nevertheless insisted that the leak be uncovered and repaired, and that soil samples be

taken around the house to find whether they would indicate moisture coming from beneath the foundation. State Farm agreed to both requests and paid for all the work to be done. In fact, State Farm either paid or offered to pay for all the work Krismer, Maverick Engineering, Glendenning and others employed by the Nicolaus did in late 1989 and in 1990 to determine the cause of their foundation problems and repair the sewer leak. But in June 1990, when the Nicolaus submitted a claim for $102,200 to correct the problems caused by the shifting foundation, State Farm refused to pay it.

In August 1990, several months after Haag and Maverick had each issued their reports, Gary Prichard, another plumber hired by the Nicolaus, found the leak beneath the hall bathroom, exactly where it had been predicted to be, and repaired it. The sewer pipe was torn in two places, and a joint had come unglued. The nature of the leak was just as Glendenning's test had indicated.

Chien N. Fu, an engineer with Trinity Engineering Testing Corporation ("TETCO") specializing in soil analysis and foundations, who held a master's degree from the University of Texas at Arlington in geotechnical engineering, took soil samples from beneath the foundation and around the house. All the samples were extremely moist, and in one hole Fu actually found water, something he had never seen in any other situation. From the core samples, TETCO and Maverick concluded that the sewer leak had increased the moisture below the house and caused the foundation to shift. They believed the slope of the lot was irrelevant because moisture might have migrated along the plumbing trench because of evidence that the permeable sand beneath the house was deeper toward the rear.

The Haag engineers remained unconvinced, however, because the core samples showed a uniform distribution of moisture around the foundation, rather than more moisture near the leak and less farther away. The Haag engineers could not offer a satisfactory explanation for the accumulation of moisture around the house, but they still believed that a leak in an unpressurized sewer line buried in clay could not account for the volume of moisture beneath the house that the tests indicated.

To test their belief, the Haag engineers constructed an elaborate reproduction of the sewer line in a plexiglassbox filled with clay, and pumped water through it. They attempted to replicate conditions existing below the Nicolaus' foundation, including the void spaces around the sewer line at the point of the leak. This test, which Haag charged State Farm more than $4,000 to conduct, tended to support Haag's conclusion. Glendenning, the Nicolaus' plumber, questioned the manner in which the test was conducted and set up his own model. Glendenning's test indicated that more water would escape from the leak than Haag estimated, although it is not clear whether, even in Glendenning's test, the larger amount would have accounted for TETCO's findings.

Based upon Haag's supplemental report of its conclusions, State Farm again, at the end of August 1990, denied the Nicolaus' claim. Fourteen months later the Nicolaus sued State Farm to recover benefits under their policy and for mental anguish and punitive damages for bad faith and violations of the Deceptive Trade Practices—Consumer Protection Act, TEX. BUS. & COM.CODE §§ 17.41–.63 ("DTPA"), and the Texas Insurance Code. The Nicolaus' central contention was that State Farm never intended to pay their claim, that it hired Haag to supply an expert opinion to be used as an excuse for denying the claim, and that Haag complied, conducting no real investigation of its own.

At trial, the Nicolaus' experts, including Krismer and Hayden, criticized Haag for not doing more work on its own, specifically, for not taking its own elevations and core samples and attempting to uncover the leak. However, no one disputed Haag's willingness to rely on the work done by the Nicolaus' experts. Moreover, Krismer had not ordered core samples or suspected a leak for more than five years. He testified that his approach was justified because "foundations are very complex things." Maverick acknowledged that the leak discovered in 1990 existed in 1984, and that its failure to find it sooner was "embarrassing".

After the leak in the sewer line was repaired, the Nicolaus' house continued to shift and crack. Krismer testified that this was due to a drying of the soil in the center of the foundation where the leak had been, causing the foundation to settle there. However, Hayden ultimately concluded that not all the problems could have been caused by the leak, and that some were inherent in the way the house had been constructed. Specifically, Hayden believed that the foundation was too light to be stable. Thomas Petrie, an engineer and the associate director of the Construction Research Center at UT–Arlington, who was hired by the Nicolaus but called to testify by State Farm, attributed some of the Nicolaus' problems to changes in the weather and to the piers constructed by Krismer in 1982. Krismer suggested that there might be other leaks beneath the house that had not been located. Even Mr. Nicolau himself acknowledged at trial that all the problems could not have been caused by the leak.

## III

The Court states that "the Nicolaus presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual." *Ante* at 448. I examine all the evidence the Court cites. I do not weigh the evidence, as that is the province of the jury; but I must consider each bit of evidence cited by the Court to determine whether it shows that State Farm acted in bad faith.

The Court first points out that Teasdale admitted that eighty to ninety percent of his work and a substantial amount of Haag's was for insurers. The Court notes that this is no evidence of bias, and of course, it is not.

The Court then says that "the evidence supports a logical inference that State Farm obtained the reports from Haag Engineering because of Haag's general view that plumbing leaks are unlikely to cause foundation damage." *Ante* at 448. With all due respect, that statement is simply not true. The only evidence the Court cites is the testimony of State Farm's superintendent, Cooper,

that he knew before he hired Haag that its engineers "were of the general opinion that a localized leak beneath the house would not cause foundation damage as a general rule. Sometimes they felt it would, sometimes they felt it wouldn't." But knowing what Haag's general views were, and hiring them to assure a denial of coverage, are quite different things. The Court concedes that Cooper's testimony alone is no evidence of bad faith, but it insinuates, without any support whatever from the record, that State Farm hired Haag to provide a basis for denying the Nicolaus' claim. The Nicolaus' experts admitted that State Farm did not always hire Haag to investigate foundation problems, and that it hired witnesses who found leaks to be the cause of the problems. Most importantly, Krismer, who was perhaps more critical of Haag and State Farm than any other witness called by the Nicolaus, and who could recall only one instance out of eighty or ninety when Haag had found that a leak caused foundation problems, testified:

Q If somebody were to say that State Farm hires Haag, and Haag only—

A That's not—

Q —finds that there's no relation between the leak and foundation movement, that would not be true, would it?

A No, that would not be true.

The Court then points out Krismer's testimony that of the eighty or ninety foundation problems in other houses he knew Haag had investigated, he was aware of only two in which Haag had attributed the cause to a sewer leak. *Ante* at 449. But Krismer did not suggest that Haag had been wrong in its assessment of any situation other than the Nicolaus', and he testified that the validity of an expert's opinion in a particular situation could not be determined by his views of other situations in the past. Hayden, the Nicolaus' engineer, testified that it was entirely legitimate to approach a situation like the Nicolaus' believing the UT–Arlington study that leaks usually do not cause foundation problems. Petrie, the engineer hired by the Nicolaus but called to testify by State Farm, stated that the differences in the opinions of the various witnesses were due, not to bias or

prejudice, but to differences in training, specialty and experience.

The Court then mentions "evidence that State Farm, and the engineers on which it relied, failed to conduct an adequate investigation." *Ante* at 449. Specifically, the Court cites testimony that Haag Engineering did not examine the leaking pipe itself or take core samples of its own. Unquestionably, Haag did not do either of these things, but equally unquestionably, they were unnecessary. One might as well criticize Haag for not testing for radon or asbestos. Haag assumed the existence of a leak as predicted by the Nicolaus' other experts and as eventually located. Haag and State Farm were aware of the exact nature of the leak that was repaired. Their view was that the leak could not allow enough water under the foundation to affect it thirty feet away where it was shifting. Krismer and Brock Thomas, the Nicolaus' general contractor, did not suggest what Haag would have gained by looking at the leak itself *when it was willing to believe their reports of what they found.* As for the core samples, Haag and State Farm reviewed the information TETCO reported from the samples it took, and there is no evidence that Haag would have gained anything by duplicating TETCO's work. Again, Haag assumed TETCO's tests were accurate, but did not agree that they showed damage caused by the leak.

As the Court notes, Ralph Cooper, State Farm's superintendent, denied the Nicolaus' claim without seeing the leak or taking core samples. But none of the Nicolaus' witnesses suggested what Haag would have gained by staring at the leak or taking additional core samples. State Farm did not ask Maverick Engineering for additional information after Maverick concluded that the leak was the cause of the problems, but the Nicolaus do not claim that Maverick had any additional information that State Farm did not already have. Inasmuch as State Farm paid for Maverick's investigation, if Maverick had any additional information, it should have provided it to State Farm without being asked. In short, State Farm and Haag reviewed all the information that the Nicolaus' experts produced in their own investigations.

There is no evidence that doing anything further would have affected their conclusions.

The Court then says that "[s]ome evidence indicates that State Farm knew, when it denied the Nicolaus' claim for the second time, that the Haag reports did not constitute a reasonable basis for denying the claim." *Ante* at 449. The only evidence the Court cites in this category is the TETCO report on the moisture content of four core samples taken at the Nicolaus' house. As she notes, State Farm did not ignore this evidence but forwarded it to the Haag engineers, who reviewed it and issued a supplemental report. Haag did not itself take core samples because it accepted those done by TETCO.

The TETCO report is evidence in support of the Nicolaus' policy claim, but it is not evidence of no reasonable basis for denying the claim, and it is certainly not evidence that State Farm *knew* there was no reasonable basis for denying the claim. While the Nicolaus believed that only the sewer leak could account for the level of moisture in the core samples, Haag explained that the leak was not a likely explanation because the moisture level was roughly the same near the leak and farther away. If all the moisture were coming from the leak, the soil should be wetter nearer the leak. There is no evidence in the record that Haag's view was wrong or unreasonable. All the evidence shows, again, is a disagreement among the experts.

Finally, the Court says that "[o]ther evidence also called into question the credibility of the Haag reports on which State Farm relied." *Ante* at 450. The Court refers to Haag's conclusions that the moisture levels found by TETCO were not high and could have been caused by natural condensation. Several witnesses, including some called by State Farm, testified that these conclusions were wrong. Assuming they were, the error does not call into question the credibility of Haag's entire reports. As noted above, even if the moisture content of the soil was high, Haag offered an explanation why the leak was not the cause, which was not only plausible as a matter of common sense but was uncontradicted in the record. A leak might raise the moisture content of the soil around

it, but the effect would necessarily be greater nearer the leak. The TETCO report indicated relatively uniform moisture levels. Haag's ultimate conclusions did not turn on whether it considered the moisture levels to be high.

Not only was this dispute relatively incidental, it was no more a matter of credibility than the dispute over the cause of the Nicolaus' problems. Both involved disagreements among experts, which, as the Court said in *Moriel,* do not prove bad faith. The fact that two engineers testifying for the Nicolaus believed that the leak caused some of the problems does not necessarily mean that the five experts who testified to the contrary for State Farm were not credible, or vice versa. Hayden's and Mr. Nicolau's concessions that the leak could not have caused all the problems, and Krismer's belief that there might have been other leaks, do not mean that the Nicolaus' claim was not credible. In each instance, the experts were struggling to account for all the facts. The Nicolaus' experts believed that the Haag reports were wrong in their entirety. Singling out one part does not make the dispute anything other than a disagreement among experts.

The Court also points to testimony by the Nicolaus' attorney on cross-examination as evidence that State Farm handled the Nicolaus' claim unreasonably. Even if bad faith could be established by the conflicting testimony of experts or by plaintiff's own testimony, surely it cannot be established by plaintiff's lawyer's testimony. I would not hold her testimony to be evidence of bad faith in this case.

## IV

State Farm could not evaluate the Nicolaus' claim without the assistance of experts. No one disputes that the two engineers it hired were highly qualified, credentialed and experienced associates in a firm with worldwide business. No one denies that the two engineers believed—not for reasons related in any way to the adjustment of insurance claims, but solely for reasons related to science—that a leak in an unpressurized sewer line embedded in the soil beneath the founda-

tion of a house cannot ordinarily cause the foundation to shift. No one challenges the legitimacy of this view as a general matter or the UT–Arlington study on which it is based. There is no evidence that the Haag engineers were predisposed to recommend denying the Nicolaus' claim irrespective of the evidence; there is direct evidence to the contrary. There is no evidence that State Farm hired Haag to provide an opinion that would justify denying the Nicolaus' claim; the direct testimony, from the Nicolaus' own witness, is to the contrary.

Undisputedly, the Haag engineers reviewed all available evidence in their reports—evidence from their own investigation and from all the Nicolaus' experts. Nothing the Nicolaus wanted examined was ignored, and State Farm paid for it all: for itself, two Haag engineers and two other engineers who testified at trial; and for the Nicolaus, a foundation repairman, two engineers, two plumbers and a general contractor. The only stone left unturned was the foundation itself.

All of the Nicolaus' complaints about State Farm's handling of their claim reduce to two: Haag's conclusion was unreasonable, and State Farm hired Haag solely to concoct an excuse for denying coverage. The first is no more than a disagreement among experts, which we have held is not evidence of bad faith. *Moriel,* 879 S.W.2d at 18. The second is unsupported by any evidence. Viewed in the light most favorable to the Nicolaus, the evidence does not support the jury's finding of bad faith.

The evidence in this case in no way depicts an unscrupulous insurer arbitrarily denying a claim to take unfair advantage of its insureds. Rather, the evidence depicts an insurer who, like the seven engineers and other experts who examined the Nicolaus' predicament, tried in good faith to determine the cause. If this dispute was not bona fide, it is hard to imagine one that would be.

The arbitrariness in this case is not in the insurer's conduct but in the cause of action. Our opinions today demonstrate that bad faith liability is as unpredictable as injury from a brick thrown out of a window or a gun

fired into a crowd. For the reasons I have explained in *Universe Life Insurance Co. v. Giles,* I would adopt a legal standard of liability that would prevent such arbitrariness. 950 S.W.2d 48 (Hecht, J., concurring).

Accordingly, I dissent.