In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-01-00075-CV

____________


JOSE FEDERICO BUSTOS, Appellant


V.


ABLE CRUSHED CONCRETE, INC. D/B/A ABLE DEMOLISHING, INC.;
A-1 ABLE SERVICES, INC.; ARTEAGA CONSTRUCTION COMPANY,
INC.; AND CERTIFIED/LVI ENVIRONMENTAL SERVICES, INC.,
Appellees






On Appeal from the 215th District Court 

Harris County, Texas

Trial Court Cause No. 98-39153




O P I N I O N
 

 Appellant, Jose Federico Bustos, was injured in a fall while working at a
jobsite. He sued several defendants for negligence, including his employer, appellee
Able Crushed Concrete, Inc. d/b/a Able Demolishing, Inc. (Able Crushed Concrete),
and appellees A-1Able Services, Inc. (A-1 Able), Arteaga Construction Co., Inc.
(Arteaga), and Certified/LVI Environmental Services, Inc. (Certified/LVI). (1) The trial
court rendered a take-nothing judgment after a jury found appellant 90 percent
negligent, found Able Crushed Concrete only 10 percent negligent, and attributed no
negligence to Certified/LVI and Arteaga. Appellant asks us to reverse the judgment
and remand the cause for a new trial because (1) the trial court abused its discretion
by refusing to submit appellant's proposed charge, (2) the evidence is factually
insufficient to support the jury's verdict, and (3) the trial court abused its discretion
by not excluding evidence of appellant's conviction for forgery. We affirm. 

Factual Background


 Able Crushed Concrete hired appellant for demolition work at Houston's Ben
Taub Hospital. Certified/LVI was the general contractor for interior asbestos and
demolition work at the hospital. Barry Honeycutt, who owned both Able Crushed
Concrete and A-1 Able, submitted the successful bid for the demolition work. 
Arteaga provided a performance bond for A-1 Able and negotiated a subcontract with
Certified/LVI. Attachments to Arteaga's contract with LVI, as well as Arteaga's own
contract with A-1 Able, show that A-1 Able, and not Arteaga, would do the
demolition work, but A-1 Able then subcontracted with Honeycutt's second company,
Able Crushed Concrete, to do the actual work. It is undisputed that appellant was
paid as an employee of Able Crushed Concrete.

 The demolition project involved removing metal air-conditioning ducts. 
Appellant had done similar demolition work for Able Crushed Concrete at the former
Rice Hotel and was considered an experienced "burner." To reach the overhead
ducts, appellant worked on a scaffold owned by Able Crushed Concrete. Honeycutt
described the scaffold as an "OSHA-approved," "Baker" scaffold. Charles Smith was
Able Crushed Concrete's on-site supervisor at the Ben Taub site. Smith instructed
appellant and directed all the work appellant did at the site. Appellant worked alone
on the scaffold. It is undisputed that he complied with Able Crushed Concrete's
safety regulations by wearing steel-toed shoes, leather gloves, and protective glasses. 
 Appellant's work involved "burning" the existing metal ductwork by cutting
it into sections from four to eight feet long. This process allowed the full length of
the duct to fall gradually, as if in "a chain," to the floor below. Appellant "burned"
the metal by using a blowtorch provided by Able Crushed Concrete. Honeycutt
explained that the blowtorch appellant used had been custom-made in a four-foot
length to ensure a safe distance between the worker and the metal he was burning.

 As individual sections of the duct were cut, the wheels of the scaffold were
unlocked, and two laborers at floor level rolled the scaffold to the next working
position under the ductwork. Appellant controlled the choice of location for the
scaffold because he knew, as the burner, how near to and far away from the duct he
could safely be to work properly and safely, considering the four-foot length of the
blowtorch, the need to ensure that the duct did not hit the scaffold as it fell, and other
factors. As the laborers moved the scaffold, appellant maintained his balance by
holding onto the guardrails, or endrails, at the ends of the scaffold. The wheels of the
scaffold were then locked in place again to stabilize the scaffold. 

 The burning produced smoke because of insulation within the duct, and there
was also a danger of fire. To reduce smoke and comply with health regulations, a
laborer at floor level had a water hose ready to minimize dust. An additional worker
stood ready with an "ABC" fire extinguisher because of the fire hazard. 

 The parties disputed how appellant's injury happened. According to appellant,
the insulation within the air duct he was cutting had started to smoke, which
prompted him to turn away from the duct to ask the floor-level laborer to pass the
water hose to appellant so that he could direct the hose to reduce the smoke. 
Appellant claimed that while he turned away to speak with the floor laborer, the duct
not only began to fall, but swung toward the scaffold as it fell and hit the scaffold
with such force that appellant was knocked off the scaffold and onto the floor, where
he landed on his feet. Appellant also claimed the impact from the falling duct was so
forceful that the wheels of the scaffold slipped. 

 Appellees relied on the testimony of Honeycutt, who interviewed all the
workers after appellant fell and also spoke with their supervisor, Smith. All
employees at the worksite told Honeycutt the duct did not swing and had been falling
correctly, in a straight path. According to the coworkers, appellant believed the
falling duct would swing and jumped off the scaffold to avoid being hit. Honeycutt
reported that appellant had jumped from the scaffold before and had been warned not
to jump again. 

 The parties also disputed how far above the floor appellant was working when
he fell or jumped to the floor. Appellant claimed the platform level on which he was
standing was either 10 or 12 feet above the floor when he fell. Appellees disputed
this vigorously. Relying on appellant's undisputed height, the dimensions of the
worksite, the size of the ducts, and other details about the worksite, including how
appellant did his work, appellees maintained the platform level on which appellant
was standing could have been only seven feet above the floor. 

Jury Charge


 Appellant's first issue challenges the jury charge. Appellant contends he is
entitled to a new trial because the trial court abused its discretion when it refused to
include, within the broad-form negligence question submitted to the jury, appellant's
proposed definition concerning the standard of care owed appellant by Certified/LVI. 
 Rule 277 of the Rules of Civil Procedure requires trial courts to submit cases
to the jury by broad-form questions, accompanied by "such instructions and
definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P.
277. Rule 278 requires that proposed instructions and definitions be substantially
correct. Tex. R. Civ. P. 278; see Willis v. Maverick, 760 S.W.2d 642, 647 (Tex.
1988). The trial court has "considerable" discretion in deciding what instructions are
"necessary and proper" and will assist the jury to render a verdict. State Farm Lloyds
v. Nicolau, 951 S.W.2d 444, 451 (Tex. 1997); Wichita County v. Hart, 917 S.W.2d
779, 873-84 (Tex. 1996). "Improper" instructions include those that mislead the jury
or are not tendered in substantially correct form. See Jackson v. Fontaine's Clinics,
Inc., 499 S.W.2d 87, 89 (Tex. 1973) ("mislead" the jury); Willis v. Maverick, 760
S.W.2d 642, 647(Tex. 1988) (not in "substantially correct" wording). A substantially
correct instruction is correct "in substance and in the main" and is not "affirmatively
incorrect." Placencio v. Allied Indus. Int'l, Inc., 724 S.W.2d 20, 21 (Tex. 1987). We
review the trial court's ruling for abuse of discretion. See Nicolau, 951 S.W.2d at
451. 

 Appellant contends he was entitled to a specialized, "premises defect"
instruction to define "negligence" as to Certified/LVI because (1) appellant had
asserted a premises-defect claim against Certified/LVI and (2) the instruction was
required under Williams v. Olivo, 952 S.W.2d 523 (Tex. 1997). Williams held that,
in a premises-defect case, a simple negligence finding would not suffice to establish
liability because an instruction incorporating the elements set forth in Corbin v.
Safeway Stores, Inc., 648 S.W.2d 292, 296 (1983), must accompany the broad-form
negligence question. Williams, 952 S.W.2d at 529. 

 The charge submitted to the jury contained a single broad-form question as to
all parties, including appellant and Certified/LVI. This question asked whether the
negligence, if any, of any party proximately caused appellant's injury. A definition
accompanying this question defined "negligence" for all parties as follows: 

 [F]ailure to use ordinary care, that is, failing to do that which a person
of ordinary prudence would have done in the same or similar
circumstances or doing that which a person of ordinary prudence would
not have done under the same or similar circumstances. 


An additional definition defined "ordinary care" as "that degree of care that would be
used by a person of ordinary prudence under the same or similar circumstances." 

 In objecting to this charge, appellant argued that the scaffold on which
appellant worked was a premise defect as a matter of law under Williams. Appellant
further contended that Certified/LVI, as a general contractor with both contractual
obligations for safety and a right of control over use of the scaffold, was required by
its contract, its own safety guidelines, and OSHA to inspect the scaffold for defects
and make it safe. The trial court overruled appellant's objections and marked his
proposed charge "refused." 

 Appellant's proposed charge contained not one, but two, broad-form liability
questions. Each inquired as to the negligence, if any, of specifically named parties. 
The first proposed question applied only to Certified/LVI. This question attempted
to track the charge mandated by Williams v. Olivo and to incorporate the Corbin
elements, as follows:

 With respect to the condition of the premises, [Certified/LVI] was
negligent if-


 a. The condition posed an unreasonable risk of harm, and 


 b. [Certified/LVI] knew or reasonably should have known of
the danger, and


 c. [Certified/LVI] failed to exercise ordinary care to protect 
[appellant] from the danger, by both failing to warn
[appellant] of the condition and failing to make that
condition reasonably safe.


Appellant's first proposed question contained the following definition of "ordinary
care":

 "Ordinary care," when used with respect to the conduct of
[Certified/LVI] as an owner or occupier of a premises, means that
degree of care that would be used by an owner or occupier of ordinary
prudence under the same or similar circumstances.


However, appellant proposed the following, additional definition:


 "Negligence," when used with respect to the conduct of
[Certified/LVI] means failure to use ordinary care, that is[,] failing to do
that which a person of ordinary prudence would have done in the same
or similar circumstances or doing that which a person of ordinary
prudence would not have done under the same or similar circumstances.


 As proposed by appellant's first question, therefore, the jury would determine
the negligence of Certified/LVI under two different negligence definitions. (2) The first
definition instructed the jury to find Certified/LVI negligent if the evidence satisfied
a three-part test. The second definition defined "negligence" as failure to use
"ordinary care"--the same definition actually submitted to the jury in the charge to
which appellant had objected. A proposed charge that contains two different
definitions of "negligence" is not in substantially correct form, misleads and confuses
the jury, and is, therefore, improper under rules 277 and 278. See Jackson, 499
S.W.2d at 89; Willis, 760 S.W.2d at 646. 

 Moreover, in addition to containing his proposed first question, appellant's
proposed charge contained a second broad-form liability question. This second,
proposed question was identical to the broad-form question the trial court actually
submitted to the jury, to which appellant had objected, and contained the same
definition of "negligence." More importantly, appellant's second, proposed question
inquired yet again about the negligence of Certified/LVI. Having proposed to submit
the alleged negligence of Certified/LVI to the jury under two different definitions of
"negligence" in his first proposed question, appellant then proposed to submit the
issue to the jury a second time and in exactly the same manner as ultimately submitted
by the trial court. 

 Appellant's proposed charge not only unfairly prejudiced Certified/LVI, by
submitting its liability to the jury twice, but created the potential for different and thus
conflicting responses because of the differing definitions of "negligence." 
Appellant's proposed charge was not only misleading, but affirmatively incorrect,
under rules 277 and 278. See Jackson, 499 S.W.2d at 89; Willis, 760 S.W.2d at 646;
Placencio, 724 S.W.2d at 21.

 We overrule appellant's first issue.

 Factual Sufficiency of the Evidence


 Appellant's second issue challenges the factual sufficiency of the evidence to
support the jury's finding him 90 percent negligent, finding Able Crushed Concrete
only 10 percent negligent, and exonerating the remaining appellees. As the party with
the burden of proof at trial, appellant's burden on appeal is to demonstrate that the
great weight and preponderance of the evidence is so contrary to the jury's verdict
that the jury's failure to find in favor of appellant is clearly wrong and manifestly
unjust. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). When this Court
reviews a "great weight" challenge, we must be mindful that the jury was not
convinced by a preponderance of the evidence. Herbert v. Herbert, 754 S.W.2d 141,
144 (Tex. 1988). Further, the jury, as the trier of fact, assesses the credibility of the
witnesses, determines the weight to accord their testimony, and resolves all conflicts
and inconsistencies in their testimony. See id.

 In conducting our review, we first examine the record to determine whether
some evidence supports the jury's failure to find in appellant's favor. See Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986). If there is evidence to support the adverse
verdict, we must then determine, in light of the entire record, whether the jury's
failure to find in appellant's favor is so contrary to the overwhelming weight and
preponderance of the evidence that the jury's adverse finding is clearly wrong and
manifestly unjust. See id.

 Viewed under these standards, ample evidence supports the jury's findings. 
Employees interviewed at the jobsite uniformly reported that appellant jumped off the
scaffold. Appellant had jumped from a scaffold before. According to these
coworkers, appellant jumped because he believed the duct was swinging toward the
scaffold and would hit him. These coworkers denied that the duct was swinging
toward the scaffold and claimed the duct had been falling in a straight line. Although
appellant maintained the duct had swung, he also conceded he had turned away from
the duct to request the water hose from the laborer at floor level. Moreover, appellant
was responsible for choosing where to place the scaffold, both to permit safe access
to the duct appellant was cutting and to ensure that the duct would fall in a straight
path and thus avoid hitting him or the scaffold. Appellant was an experienced burner
who had the necessary skills to do the work and make these assessments. 

 In contending that the great weight of the evidence preponderates against the
jury's adverse findings, appellant focuses primarily on OSHA regulations that require
side guardrails, in addition to end guardrails, when a worker is standing on a platform
level that is more than ten feet above the floor. (3) See 29 C.F.R. 1926.451(g)(1) (2001). 
Appellant maintained he was 12 feet above the floor at one point, but also conceded
he did not know exactly how high the scaffold was. In addition, as noted above, the
parties vigorously disputed appellant's testimony, which appellees impeached as
presenting a physical impossibility, given several factors, including appellant's
height, the dimensions of the worksite and the size of the blowtorch and the air-conditioning ducts. 

 Appellant also contends the ductwork he was cutting down was a "falling
object" under OSHA regulations that require barriers to protect workers on scaffolds
from falling objects. See 29 C.F.R. 1926.451(h)(1) (2001). Once again, the evidence
concerning the condition that would trigger the regulation is disputed. Appellant
alone contended the duct hit the scaffold and caused him to fall. His coworkers all
reported the duct had been coming down straight and that it did not hit the scaffold. 

 Finally, appellant challenges the jury's failure to attribute liability to
Certified/LVI, Arteaga, and A-1 Able, on the grounds that provisions in each of the
several contracts and subcontracts pertaining to the demolition work imposed
guidelines, requirements, and responsibilities concerning safety. A contractor who
exercises a right of supervisory control over the employees of an independent
subcontractor may incur liability for injuries to those employees. See Coastal Marine
Serv. v. Lawrence, 988 S.W.2d 223, 225-26 (Tex. 1999). But the supervisory control
must relate to the activity that caused the injury and must involve either the power to
direct that the work be done in a certain manner or forbid its being done in an unsafe
manner. Id. at 226. Although right of control can be shown by express contractual
agreement or evidence of actual control, a mere possibility of control does not
establish that a contractor actually retained or exercised a right of control. Id. A
contractor's liability for injuries to the employees of a subcontractor is commensurate
with the control retained over the subcontractor's work. Hoechst-Celanese Corp. v.
Mendez, 967 S.W.2d 354, 355 (Tex. 1998). 

 Despite the contractual guidelines, requirements, and responsibilities
concerning safety in the varying contracts, the overwhelming weight of the evidence
shows that Smith, and not Arteaga or Certified/LVI, not only supervised appellant at
the worksite as an employee of Able Crushed Concrete, but exercised actual control 

over all details of the demolition work. Smith was responsible for safety for both A-1
Able and Able Crushed Concrete. He had a good safety record, made safety a
priority, and held daily safety meetings at the worksite. Smith instructed employees
to do, "[w]hat I say, when I say, and how I say." Employees were fired if they did
not. Smith was among the employees whom Honeycutt interviewed at the worksite
and who confirmed that appellant jumped off the scaffold and did not fall. 

 We conclude that we must defer to the jury's resolution of the many conflicts
in the evidence and that the weight of the evidence does not so greatly preponderate
against the jury's failure to attribute negligence to Certified/LVI, Arteaga, A-1Able,
and Crushed Concrete in sufficient percentages to create liability as to render clearly
wrong and unjust the jury's verdict finding appellant 90 percent negligent and Able
Crushed Concrete only 10 percent negligent. 

 We overrule appellant's second issue.

Evidence of Forgery Conviction


 In his third issue, appellant contends the trial court abused its discretion by not
excluding evidence that appellant was convicted of forgery for using a fake Social
Security card. The record reflects, however, that appellant referred to the conviction 

himself in his opening statement to the jury and therefore waived any error. See
McInnes v. Yamaha Motor Corp., U.S.A., 673 S.W.2d 185, 188 (Tex. 1984). 

 We overrule appellant's third issue.

Conclusion


 We affirm the judgment of the trial court.



 Elsa Alcala


 Justice


Panel consists of Justices Taft, Alcala, and Price. (4)


Do not publish. Tex. R. App. P. 47.4.

1. Appellant also sued Barry Honeycutt, who owned both Able Crushed Concrete
and A-1 Able, in his individual capacity, but nonsuited those claims with
prejudice before the case went to the jury. 
2. Compare Comm. on Pattern Jury Charges, State Bar of Tex., Texas
Pattern Jury Charges PJC 66.3 (2000).
3. It is undisputed that the Baker scaffold at issue here had end guardrails and that
appellant stabilized himself when the scaffold was being moved by holding
those end guardrails. 
4. The Honorable Frank C. Price, former Justice, Court of Appeals, First District
of Texas at Houston, participating by assignment.