Affirmed and Memorandum Opinion filed August 30, 2007








Affirmed and Memorandum
Opinion filed August 30, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00762-CV

_______________

 

IN THE INTEREST OF C.L.S.

                                                                                                                                                

On Appeal from the 300th District Court

Brazoria County, Texas

Trial Court Cause No.  30031

                                                                                                                                                

 

M E M O R A N D U M    O P I N I O N

In this appeal from the trial court=s order terminating the parental
rights of a mother and father to their minor daughter, the mother challenges
the legal and factual sufficiency of the evidence to support the jury=s termination findings and the court=s refusal of her proposed jury
instruction.  The father challenges the finding that the petitioning state
agency exercised due diligence to serve his citation.  We affirm.

I.  Factual and Procedural Background








Appellants Candace and Adam are the
married, but separated, parents of C.L.S.  On March 4, Brazoria County Child
Protective Services, Texas Department of Family & Protective Services (Athe Department@) took possession of C.L.S. under
Chapter 262 of the Texas Family Code based on allegations of abuse and neglect.[1] 
The Department subsequently moved to terminate Candace=s and Adam=s parental rights.  

When C.L.S. was born in 2002, Candace
and Adam lived with Adam=s mother in Alvin, Texas.  According to Candace, Adam had
developed an addiction to prescription drugs after an on-the-job injury that
had occurred just prior to the child=s birth.  Candace described this drug
problem as a Arelapse@ based on Adam=s prior drug use several years earlier.[2] 
After his injury, Adam left his job, supporting both himself and his family
with worker=s compensation payments and gifts of cash from his mother.  During this
period, Candace was completely dependent on Adam for financial support. 
According to Candace, Adam saw multiple doctors in order to obtain different
prescription drugs to support his habit.  A year later, Candace discovered that
Adam had also been using illegal drugs.

While Candace was still living with
Adam, she began to allow her paternal aunt, Nina, and her aunt=s husband, David (collectively, the AIntervenors@), to spend increasing amounts of
time with C.L.S.  At the time, Candace felt very close to them.  Candace also
felt she needed help with C.L.S. since, as she described it, Adam was not going
to be a part of the child=s life.  The Intervenors did not have any children of their
own, and wanted to be Aa big part@ of C.L.S.=s life.

According to Nina, the frequency of
her care for C.L.S. increased significantly in early 2004.  Nina testified that
she began to receive regular calls to pick up C.L.S. from Adam=s mother.  Aside from brief periods
C.L.S. spent with Candace=s grandmother, the Intervenors became C.L.S.=s only regular babysitters.  During
this period, C.L.S. would spend about Aa weekend a month@ with them.

Eventually, Candace confronted Adam
about his drug use, and the couple agreed that Candace would take C.L.S. and
leave the marriage.  Nevertheless, Candace and C.L.S. 








continued to live with Adam and his
mother.  Candace testified that because Adam was afraid that Candace and C.L.S.
would soon leave, he locked Candace out of the house and denied her access to
C.L.S. for approximately three weeks.  The police were regularly called to the
family home as Candace attempted to retrieve C.L.S.  In March 2004, Candace
successfully removed C.L.S. with the help of Adam=s father, and she and C.L.S.
permanently moved out of the family home.  Adam continued to live in the house
as it deteriorated into a Ahorrid@ and Adeplorable@ condition without running water or electricity. 

After Candace left, she took C.L.S.
to the home of the Intervenors and allowed her to live there while she resided
with friends.  C.L.S. remained with the Intervenors from May to August of
2004.  During this period, Candace had no contact with C.L.S.  Because both
Nina and David were employed, they ultimately enrolled C.L.S. in daycare at
their own expense.  They also bought clothes, food, diapers and other necessary
items for C.L.S.   

A.        The
Investigations

On May 16, 2004, the Department began
its first investigation into the possible abuse and neglect of C.L.S.  This
investigation was initiated in response to reports that the parents were using
drugs, had a history of drug use, and that the home was deteriorating and
without utilities.  A caseworker made several unsuccessful attempts to contact
Adam or Candace at the family home; however, the caseworker did visit the
Intervenors in their home and observed C.L.S. there.  According to Candace,
this investigation was initiated by Adam=s father and members of her own
family who were trying to convince her to  remove herself and C.L.S. away from
Adam and his Avery serious@ drug problem.  On May 29, 2004, the Department wrote to
Candace and informed her that it had concluded Candace Adid not have a role in the alleged
abuse or neglect.@ 








In July 2004, Candace was arrested
for possession of crack cocaine based on residue found on a pipe discovered in
her possession.  Candace claimed that she was merely holding the pipe for
Adam.  She pleaded guilty and was given three years= deferred adjudication.  Also in July
2004, the Intervenors entered into a Child Safety Plan with the Department. 
This plan, unsigned by Candace, stated that C.L.S. would be placed with the
Intervenors, who would provide for her care.  The plan also prohibited Candace
and Adam from reclaiming possession of the child.  The plan was developed in
response to the Department=s inability to locate or contact Adam or Candace, as well as
the Department=s determination that living with the Intervenors was the best option for
C.L.S. at that time. 

After C.L.S. had lived with Nina and
David for approximately four months, Candace moved into an apartment with her
grandmother.  Candace=s grandmother lived near the Intervenors= house, and Candace saw C.L.S. Aseveral times a week.@  During a family gathering at a
restaurant in September 2004, Candace forcefully took possession of C.L.S. from
Nina.  Although Candace=s family called the police and the Intervenors invoked the
Department=s Safety Plan, Candace was allowed to leave with her daughter.  On the
next business day, the Intervenors signed a Child Safety Plan stating that
Candace volunteered to place C.L.S. with them until November 10, 2004.  The
plan was signed by a Department caseworker and by the Intervenors but was not
signed by Candace.

On October 18, 2004, the Department
wrote to Candace and informed her that Athe report made on your family has
been investigated and there was not sufficient information to determine if the
abuse/neglect did occur and we will be providing further services.@  On the same day, Candace signed a
Child Safety Plan with the Department, committing herself to substance abuse
testing and lifestyle monitoring by the Department and participation in family
services through December 1, 2004.  Despite numerous requests from the
Department, Candace failed to complete any family services during that time. 
Nevertheless, the Department completed its investigation on December 28, 2004,
and again concluded that Candace did not have a role in the alleged abuse or
neglect. 

B.        The
Removal








In early 2005, Candace decided to
obtain employment.  Her efforts at finding a job were impaired by her lack of a
valid driver=s license.  Her license had expired, and she was unable to renew it
because of an outstanding warrant for disturbing the peace.  In order to remove
the warrant blocking renewal of her license, Candace reported to the Galveston
police and served two days in jail.  

On March 3, 2005, while Candace was
in jail, the Department took emergency custody of C.L.S. and placed the child
in the temporary care of the Intervenors.  This action was taken after reports
and complaints from family members that Candace was gone and had left C.L.S.
with Candace=s elderly grandmother.  On March 10, 2005, Candace signed a lease on a
house that she was to share with her then-girlfriend (the AForrest Lane house@). 

At the emergency custody hearing on
March 15, 2005, the judge awarded temporary managing conservatorship of C.L.S.
to the Department, and the Department placed C.L.S. with the Intervenors.[3] 
The trial court also issued temporary injunctions restraining Candace and Adam
from removing C.L.S. and issued temporary orders stating requirements for the
restoration of their full parental rights. 

After the Department obtained custody
of C.L.S., Candace descended into what she described as a Avery dark@ depression.  During this period, she
abused drugs heavily, and was, as she described herself, Aunfit to be anywhere near@ her child.  She abandoned the lease
on the Forrest Lane house, and although Candace and Adam occasionally spent the
night there, only Candace=s girlfriend lived in the Forrest Lane house consistently. 
When not staying at this house, Candace lived with friends and, on occasion,
with Adam.  Ultimately, the Forrest Lane house was allowed to deteriorate until
it was abandoned by all parties.  Upon later inspection, the landlord
discovered drug paraphernalia and a dead pet that had been given to C.L.S. by
the Intervenors.








According to Candace, her family
helped her pull out of her depression and stop abusing drugs.  During the
autumn of 2005, Candace began working at a store, and maintained her job for
approximately three-and-a-half months.  But in November 2005, Candace quit,
left her grandmother=s apartment, and again lived with Adam for three months. 
During this time, they did not maintain a regular home or address, but lived
primarily in extended-stay motels or stayed with friends.              

In February 2006, Candace left Adam
and lived with a friend for some time.  Later that month, she moved into her
grandmother=s new apartment.  In April 2006, Candace worked for approximately
two-and-a-half weeks at a store in Webster.  After that, she began working at a
restaurant in May.  In mid-July 2006, Candace began working in the office of a
transmission repair shop, where she was still employed at the time of trial in
August 2006. 

At trial, it was established that in
the period since C.L.S.=s removal, Candace had exercised her right of visitation with
the child between eight and fifteen times out of a possible thirty-four
opportunities.  

Candace testified that she had spoken
to Adam about the termination proceedings during each period when they lived
together in 2005.  She expressed certainty that Adam was aware of the
proceedings; however, she stated that she had not to have heard from Adam since
January 2006.   








The case was tried to a jury, which
found by clear and convincing evidence that: (1) Adam failed to register
with the paternity registry, and despite due diligence, the Department failed
to locate him; however, Adam was duly served with citation[4]
and appointed an attorney; (2) Candace and Adam each knowingly placed or
knowingly allowed C.L.S. to remain in conditions or surroundings that
endangered her physical or emotional well-being; (3) Candace and Adam each
engaged in conduct or knowingly placed C.L.S. with persons who engaged in
conduct that endangered her physical or emotional well-being; (4) Candace and
Adam each failed to support the child in accordance with their respective
abilities during a period of one year ending within six months of the date of
the filing of the petition; (5) termination of the parent-child relationships
between Adam and C.L.S. and between Candace and C.L.S. was in the child=s best interests; (6) Candace
voluntarily left C.L.S. alone or in the possession of another not the parent
without expressing an intent to return, without providing for C.L.S.=s adequate support, and remained away
for a period of at least three months; and (7) Candace failed to comply
with the provisions of a court order that specifically established the actions
necessary for her to obtain C.L.S.=s return after the child had been in
the temporary managing conservatorship of the Texas Department of Family and
Protective Services (ATDFPS@) for not less than nine months as a result of the child=s removal from the parent under
Chapter 262 of the Texas Family Code for the abuse and neglect of the child.   


On August 11, 2006, the court signed
a judgment terminating Candace=s and Adam=s parental rights to C.L.S. and appointed the Intervenors as
joint managing conservators of the child. 

II.  Issues Presented

In her first issue, Candace argues
the evidence is legally and factually insufficient to support the jury=s findings of fault under section
161.001 of the Texas Family Code.  She contends in her second issue that the
trial court erred in refusing to instruct the jury that  termination of
parental rights cannot be based on a single act or omission endangering the
child.

In a single issue, Adam contends that
the Department did not exercise due diligence in attempting to locate him.[5]

III. 
Analysis

A.        Candace

1.         Challenges
to Legal and Factual Sufficiency








Because termination of parental
rights is a drastic remedy, due process and the Texas Family Code require the
Department to prove the necessary elements by the heightened burden of Aclear and convincing evidence.@  See Tex. Fam. Code Ann. ' 161.001 (Vernon Supp. 2006); In
re B.L.D., 113 S.W.3d 340, 353B54 (Tex. 2003).  In this case, the
Department had to prove by clear and convincing evidence that Candace engaged
in one of the behaviors described in subsections 161.001(1)(B), (D), (E), (F),
or (O).  See Tex. Fam. Code Ann.
' 161.001.[6] 
A>Clear and convincing evidence= means the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established.@ Id. ' 101.007 (Vernon 2002).

In reviewing the legal sufficiency to
support the jury=s termination findings, we look at all the evidence in the
light most favorable to the jury=s findings to determine whether a
reasonable factfinder could have formed a firm belief or conviction that these
finding are true. In re J.L., 163 S.W.3d 79, 85 (Tex. 2005).  We presume
that the factfinder resolved disputed facts in favor of its findings if a
reasonable factfinder could do so.  Id.  We disregard any contrary
evidence if a reasonable factfinder could do so, but we do not disregard
undisputed facts.  Id.

In reviewing the factual sufficiency
of the evidence, we review the evidence in a neutral light and determine
whether the evidence is such that the jury reasonably could form a firm belief
or conviction about the truth of the State=s allegations.  In re J.F.C.,
96 S.W.3d 256, 266 (Tex. 2002).  We will not conclude that the evidence is
factually insufficient unless, in light of the entire record, a reasonable
factfinder could not have formed such a belief.  Id.  In reviewing the
evidence, we  give due deference to a jury=s factfindings and do not supplant
the jury=s judgment with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).








On appeal, the Department contends
that the grounds for termination are legally and factually sufficient under
sections 161.001(1)(E), (F), and (O).  We need only determine if the evidence
is legally and factually sufficient to support a single basis for termination.[7]
 See Tex. Fam. Code Ann. ' 161.001.

2.         Section
161.001(1)(E)

Subsection (E) permits termination of
parental rights where the parent has either: (1) personally engaged in
conduct which endangers the child, or (2) knowingly placed the child with
another person who engaged in dangerous conduct. Id. ' 161.001(1)(E); In re J.A.J.,
225 S.W.3d 621, 628 (Tex. App.CHouston [14th Dist.] 2005, pet. filed) (maj. op. on reh=g).  As used in this statute, Aendanger@ means to Aexpose to loss or injury; to
jeopardize.@ In re M.C., 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting
Tex. Dep=t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987)).  AAlthough >endanger= means more than a threat of
metaphysical injury or the possible ill effects of a less‑than‑ideal
family environment, it is not necessary that the conduct be directed at the
child or that the child actually suffers injury.@  Id. (quoting Boyd,
727 S.W.2d at 533).  The relevant inquiry involves the parent=s acts and omissions.  In re
J.A.J., 225 S.W.3d at 628.   Termination may not ordinarily be based on a
single transaction, but rather Aa showing of a course of conduct is required.@  Id. (quoting In re D.P.,
96 S.W.3d 333, 338 (Tex. App.CAmarillo 2001, no pet.)); see also In re D.T., 34
S.W.3d 625, 634 (Tex. App.CFort Worth 2000, pet. denied) (A[A] voluntary, deliberate, and
conscious >course of conduct= by the parent is required.@).  Endangerment under section
161.001(1)(E) may include evidence of drug addiction and its effect on a parent=s life and ability to perform the
duties of a parent.  In re U.P., 105 S.W.3d 222, 234 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied).  Conduct that subjects a child to a life of uncertainty and
instability also endangers the physical and emotional well‑being of a
child.  In re R.W., 129 S.W.3d 732, 739 (Tex. App.CFort Worth 2004, pet. denied). 








At trial, Candace openly admitted to
multiple episodes of Aendangering@ conduct after the birth of her child.  She admittedly
pleaded guilty to a charge of cocaine possession in July 2004, resulting in
deferred adjudication for three years.  She admitted she violated her probation
on many occasions by using drugs and alcohol, and each violation subjected her
to the risk of immediate incarceration.  She also admitted that she tested
positive for alcohol in a probation-related urinalysis screening just one month
prior to trial.

Candace also admitted she served two
days in jail in order to satisfy an outstanding warrant.  Although she
testified that she had previously arranged for her grandmother to care for
C.L.S. during the day and Nina to care for the child at night, Nina denied
knowledge of any such plan before Candace went to jail.  

Candace further admitted that, after
the Department removed her daughter in early March 2005, she embarked upon a
four-month Adrug binge.@  During this period, she Adropped out of her life@ and began Aheavily@ using ecstasy, marijuana, cocaine,
and alcohol, all in violation of her probation and of the trial court=s temporary orders.  Candace
described herself as being Alost@ during those months; she testified that she abandoned the
lease that she had signed on March 10, 2005, and moved from place to place.[8] 
Despite Adam=s addictions, Candace also continued her relationship with Adam during
this time.  As she readily admitted, Candace was Anot in any way fit to be near [her]
daughter@ during this period. 

Candace=s father-in-law testified that after
C.L.S. was born in December 2002, Candace told him that she was actively
selling drugs because Ashe had people to take care of.@  Other witnesses testified that
while Candace and C.L.S. lived with Adam and his mother, Adam was beaten at the
family home in altercations connected with drug dealing.  An Alvin police
officer testified that Candace was arrested for public intoxication in May
2004.  Two other officers from the Pearland Police Department testified that on
May 11, 2005, when answering a call to the Forrest Lane house, they discovered
drug paraphernalia and baby clothes.  They described the premises as being in Ahorrid@ and Adirty@ condition.  








Both Candace=s first and current counselors
testified that Candace refuses to accept responsibility for her situation.[9] 
In her own trial testimony, Candace repeatedly stated that she feels her
separation from her daughter was brought about by interference from her family
and the Department.  Although she expressed a strong desire to be reunited with
her daughter, she also admitted that she would be forced to rely upon her
family and the Department for childcare.  She further testified that the
longest period during which she had been employed since the birth of her child
was for three-and-a-half months in the fall of 2005. 

Candace argues that termination is
unsupported because C.L.S. was not present during any of her drug-related
activities.  But even assuming the truth of this assertion, it does not
undermine the sufficiency of the evidence.  The Department is not required to
prove that the child was present or even born at the time of the misconduct.  See
In re S.F., 32 S.W.3d 318, 322 (Tex. App.CSan Antonio 2000, no pet.).  The jury
could properly consider Candace=s drug history, housing instability, and continued alcohol
use as part of a continuing course of conduct endangering C.L.S.=s physical or emotional well-being.  See
In re D.M., 58 S.W.3d 801, 812B13 (Tex. App.CFort Worth 2001, no pet.)
(considering mother=s drug use and housing instability as factors showing legal
and factual sufficiency of evidence supporting endangerment finding).  Even
incarceration for failure to pay fines is a fact properly considered by the
jury.  Id.[10]








Viewing all the evidence in the light
most favorable to the judgment, we find the jury reasonably could have formed a
firm belief or conviction that the findings are true.  We therefore conclude
that the evidence supporting the endangerment finding is legally sufficient.  See
In re J.L., 163 S.W.3d at 85.  Considering the evidence in a neutral light,
we further conclude that the evidence is factually sufficient to support a
reasonable jury=s firm belief or conviction that Candace has engaged in a
voluntary, deliberate, and conscious course of conduct that endangered C.L.S.=s physical or emotional well-being.  See
In re J.F.C., 96 S.W.3d at 266; In re J.A.J., 225 S.W.3d at 628.  We
therefore overrule Candace=s first issue.

2.         Challenge
to Jury Charge

In her second issue, Candace contends
that the trial court erred by failing to submit the following instruction:

In determining whether a parent
engaged in conduct that endangered the child or knowingly placed the child with
persons who engaged in conduct that endangered the child, there must be a
showing of a course of conduct by the parent that endangered the child, and
termination cannot be based on a single act or omission of endangerment.

 

We review allegations of charge error
for abuse of discretion.  Texas Dep=t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).  

Here, Candace argues that the failure
to include this proposed instruction was an abuse of discretion because the
instruction is explicitly based on Doria v. Texas Department of Human
Resources.  747 S.W.2d 953 (Tex. App.CCorpus Christi 1988, no writ).  In Doria,
the Corpus Christi Court of Appeals concluded that evidence a mother left her
children alone a single time was factually insufficient to support termination
of her parental rights.  Id. at 959.  But Doria does not concern
jury charge error, and Candace cites no other authority for the proposition
that refusal of her proposed jury instruction constitutes an abuse of
discretion.[11]








A trial court abuses its discretion
only when it acts without reference to any guiding principle.  E.B., 802
S.W.2d at 649.  Moreover, a trial court has considerably more discretion in
submitting instructions and definitions than it has when submitting jury
questions.  M.N. Dannenbaum, Inc. v. Brummerhop, 840 S.W.2d 624, 631
(Tex. App.CHouston [14th Dist.] 1992, writ denied).  The trial court must submit Asuch instructions and definitions as
shall be proper to enable the jury to render a verdict.@  Tex.
R. Civ. P. 277.  This rule affords the trial court considerable
discretion to decide what instructions are necessary and proper in submitting
issues to the jury.  State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451B52 (Tex. 1997).  It is well-settled
that a jury charge that Atracked the statutory language in the instruction and then
asked the controlling question@ does not amount to an abuse of discretion.  E.B., 802
S.W.2d at 649.  Accordingly, we overrule Candace=s second issue.

B.        Adam

Adam contends that the evidence is
legally and factually insufficient to show that the Department exercised due
diligence to locate him.  We disagree.  The finding of due diligence is
supported by evidence that the Department=s attempts to locate Adam included
the following:

1.         A Department supervisor conducted an
internet search of jails and prisons;           

2.         Service was attempted at two addresses;

3.         A caseworker visited a third address to
look for Adam;

4.         The Department sent a certified letter
concerning this suit to Adam, and Adam signed and accepted the letter;

5.         A caseworker asked Candace for Adam=s address, and Candace reported that she did not know
Adam=s whereabouts;

6.         After the Intervenors reported that Adam
might be staying with his mother, Lynn, at a hotel or motel known as ATweety=s@ and that Lynn might be staying with a New Orleans
evacuee, a Department supervisor visited two such businesses and could not
locate Adam=s mother or learn if an evacuee was staying there; and

7.         A
Department supervisor spoke to Candace=s grandmother and was told that Adam
was not staying there.








When these efforts were unsuccessful,
the Department accomplished citation by publication.  Under the standards for
legal and factual sufficiency previously described, a reasonable jury could
form a firm belief or conviction that the allegations of due diligence are
true.  We therefore overrule Adam=s sole issue.

IV.
Conclusion

With regard to Candace, we conclude
that the evidence is legally and factually sufficient to support the jury= finding that she engaged in conduct
that endangered C.L.S.=s physical or emotional well-being.  We further hold that the
trial court did not abuse its discretion by refusing Candace=s proposed jury instruction. 
Accordingly, we overrule both of her presented issues.  We likewise overrule
Adam=s challenge to the finding that the
Department exercised due diligence in attempting to locate him.  Accordingly,
we affirm the 

trial court=s judgment terminating the parental
rights of both Candace and Adam.

 

 

 

 

 

/s/        Eva M. Guzman

Justice

 

 

Judgment rendered and Memorandum
Opinion filed August 30, 2007.

Panel consists of Justices Frost,
Seymore, and Guzman.                                     









[1]  Brazoria County Child Protective Services is a
division of Texas Department of Family & Protective Services.





[2]  Candace also admitted to her own regular drug use,
occurring approximately seven years before the trial. 





[3]  No transcript of the hearing is in the record.





[4]  Adam was served by publication.





[5]  Although the Department attempted to locate Adam and
served him by publication, Adam phrases his appeal as a challenge to TDFPS=s failure to serve him.  Brazoria County Child
Protective Services is the division of TDFPS that actually brought the suit;
thus, for clarity, we refer to the actions of the Department.





[6]  Candace does not challenge the jury=s finding that termination of her parental rights is
in her daughter=s best interest.





[7]  The Department concedes the insufficiency of the
evidence to support the jury=s findings
under subsections (1)(B) and (1)(D).





[8]  For example, on April 2, 2005, neighbors called the
police to investigate noises at the abandoned residence that Candace formerly
shared with Adam.  The police discovered Candace and her girlfriend having sex
in the derelict house, which was strewn with filth.  





[9]  Candace saw her first counselor four times.  Three
months later, she was discharged from therapy for absenteeism.  She later saw a
second counselor three times, but made no further appointments.  The second
counselor testified that they had not reached the initial stage of setting
goals for therapy, but Candace had not scheduled any additional appointments.





[10]  Candace further argues on appeal that the evidence
offered to support the finding under subsection (E) is legally insufficient
because it related to conduct that occurred after the Department=s petition had been filed.  However, she offers no
authority to support the argument that this evidence was beyond the jury=s consideration, nor did she object to the admission
of the evidence on this basis at trial.  The argument is therefore waived.  See
Tex. R. App. P. 33.1(a),
38.1(h).





[11]  Appellant mentions In re D.P., 96 S.W.3d 333
(Tex. App.CAmarillo 2001, no writ); however, D.P. concerns
factual insufficiency arising when the child=s
injuries could have been inflicted by one of several people and the Department
of Protective and Regulatory Services admits there is Alittle evidence@
that the appellant placed her child in conditions endangering her son=s well-being.  The case does not mention Doria or
charge error, and appellant seems to have cited it merely for the standard of
review applicable to a challenge to the factual sufficiency of evidence of
endangerment.